2021 IL App (1st) 191692-U

No. 1-19-1692

Order filed December 17, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8398 |
| | ) | |
| JEROME FLAGG, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions are vacated and the matter is remanded for a new trial because the circuit court erred by denying defendant his right to be present at a critical stage of proceedings.

¶ 2    After a bench trial, the circuit court found defendant Jerome Flagg guilty of two counts of predatory sexual assault and one count of aggravated criminal sexual abuse. He was sentenced to an aggregate term of 21 years' imprisonment. He appeals, arguing that the court erred by admitting the video of a Victim Sensitive Interview (VSI) into evidence without first viewing it, and violated

his constitutional right to be present at all critical stages by viewing the VSI video in chambers during trial. We vacate defendant's convictions and remand for a new trial.

¶ 3                                               **BACKGROUND**

¶ 4      Defendant was charged by indictment with 14 counts of sexual abuse of the victim S.C., including count I for predatory criminal sexual assault of a child based on contact between defendant's penis and S.C.'s "sex organ" when she was under 13 years old (720 ILCS 5/11-1.40(a)(1) (West 2014)), count III for predatory criminal sexual assault of a child based on contact between defendant's penis and S.C.'s mouth when she was under 13 years old, and count XI for aggravated criminal sexual abuse based on defendant touching S.C.'s breast for the purpose of sexual arousal or gratification when she was under 18 years old and defendant was a family member (720 ILCS 5/11-1.60(b) (West 2014)). The incidents allegedly occurred from January 27, 2015, through April 6, 2016.

¶ 5      At a proceeding on March 8, 2017, the State tendered the VSI video to defense counsel. The trial court granted defense counsel's motion to bring a laptop computer into the jail to show defendant "the videos." On April 17, 2017, at another proceeding, defense counsel indicated she had not yet shown defendant what the court described as "the forensic interviews." A different public defender later assumed representation, and the court entered another order on November 15, 2018, permitting counsel to bring a DVD and laptop into the jail "to view discovery" with defendant.

¶ 6      On May 31, 2019, the State moved for a hearing pursuant to 725 ILCS 5/115-10 (West 2018), seeking admission of S.C.'s hearsay statements to her family and those contained in the VSI video. The motion explained that Shawntae Jones, a child forensic interviewing specialist,

conducted the VSI at the Chicago Children's Advocacy Center (CAC). The motion also noted that S.C. would testify at trial.

¶ 7     The State attached a summary of the statements to the request, which is included in the record on appeal. The summary indicates that on April 6, 2016, S.C. told various family members that defendant "pulled down her pants and tried to put his penis in her vagina" on "numerous occasions," and once tried to place his penis in her mouth.

¶ 8     The VSI summary indicates that on April 7, 2016, Jones interviewed S.C. at the CAC regarding her allegations against defendant. Jones "established that [S.C.] understood the difference between the truth and a lie." S.C. stated that defendant "touched her." On the first occasion, S.C. and defendant were playing video games in his bedroom when he "put a blind fold [*sic*] over her eyes, took off her underwear and pants and tried to put his penis in her vagina." His penis "went inside her vagina but not all the way in." S.C. was 11 years old. She further stated that defendant sexually abused her on other occasions. Specifically, approximately a month after the first incident, while the two were again in his bedroom alone, defendant kissed and touched S.C. on her "tatas" and "booty" over her clothes. On another occasion, he entered S.C.'s bedroom while she slept, removed her pants, and attempted to insert his penis in her vagina, during which his penis contacted her vagina. Additionally, shortly before her twelfth birthday, defendant tried to "push his penis in [S.C.'s] mouth." She pushed him away, but his penis contacted her lips and tongue. In another instance, she awoke in her bedroom to see defendant's head near her vagina, though he took no further action. On the final occasion, in February or March 2016, defendant again entered S.C.'s bedroom while she slept, touched her buttocks, and tried unsuccessfully to remove her pants.

¶ 9    During the section 115-10 hearing, Donald G. testified that in April 2016, he lived in a home on the 6500 block of South Mozart Street in Chicago, Illinois, with his wife Carolyn C.-G., Carolyn's niece S.C., his grandson L.L.[1] and his daughters Donita C. and Donmisty C. Defendant, Donmisty's husband, and their son also lived in the home. On April 6, 2016, Donald received a phone call from Carolyn, who was "in a panic." She told Donald that defendant returned home that day without Donmisty, whom Carolyn could not locate. During the call with Carolyn, Donmisty called Donald from a police station in LaGrange, Illinois. She went to the police station because she discovered defendant had pictures of Donita in the shower on his phone, and when Donmisty confronted him, he also admitted that "he had been having sex with S.C."

¶ 10    Donald drove Donmisty home from the police station. When they arrived, Donmisty told the family of defendant's admission. Carolyn became upset and confronted S.C., who started crying. Carolyn also called the police, but when the officers arrived and attempted to speak with S.C., she was unresponsive. At this point, Donald went with S.C. to a separate room, where S.C. told him that defendant "had been trying to have sex with her." S.C described the blindfold incident, and stated defendant attempted sexual acts with her "several times."

¶ 11    On cross-examination, Donald testified that prior to April 6, 2016, he never observed any inappropriate behavior from defendant towards S.C., nor had S.C. informed him of such behavior. After Donmisty informed the family of defendant's conduct, Carolyn shouted at S.C. "to tell what happened." S.C. did not respond initially, then denied that anything happened before ultimately speaking to Donald. S.C. did not tell Donald when the first incident occurred or how many times

_____

[1] This individual is identified as both L.L. and L.M. in the report of proceedings; we refer to him as L.L.

defendant attempted to insert his penis in her vagina. S.C. told Donald that she did not tell anyone of the incidents because defendant "threatened her that, if she told, *** [Donmisty's] baby would be taken away." The court continued the hearing to a later date.

¶ 12    When the hearing resumed, defendant stated, "I want to state for the record ineffective counsel." He continued in relevant part that defense counsel "showed me the video, but they sped through it, so I really didn't get a good look at it." He further stated, "I have not seen anything in my discovery; police reports, witness' testimony, accuser statement, [etc.]."

¶ 13    When the hearing resumed, Jones testified that she interviewed S.C. at the CAC on April 7, 2016. Jones started by "building rapport" with S.C., then transitioned to discuss S.C.'s family, at which point S.C. "went into a disclosure" regarding the incidents. During the disclosure, Jones asked "open-ended questions, multiple choice questions and *** yes or no questions." Jones agreed that S.C. disclosed allegations of sexual abuse, and used terminology typical of her age. Jones determined that S.C. understood the difference between the truth and a lie "near the end of the interview."

¶ 14    The State introduced People's Exhibit No. 1, a DVD containing the VSI video. Jones testified the video was an accurate depiction of the VSI.

¶ 15    On cross-examination, Jones agreed that it is best practice to determine that an interviewee knows the difference between the truth and a lie at the outset of an interview. Jones did not follow that procedure here, however, because S.C. went into active disclosure when Jones asked about S.C.'s family, and it was also "best practice *** if the child goes into disclosure that you allow them to continue."

¶ 16    Following argument, the court admitted the VSI video but barred Donald's testimony regarding S.C.'s statements on April 6, 2016. In so ruling, the court explained that Jones's testimony demonstrated "sufficient safeguards of reliability" for the VSI video. Regarding S.C.'s statements to Donald, however, the court believed the family's agitated condition and S.C.'s initial unwillingness to speak freely suggested the testimony did not have sufficient safeguards of reliability. The prosecutor asked, "I am assuming by your ruling that *** because this is a bench trial that you will evaluate the content of the video *** as we publish it." The court responded, "Right. That's a trial issue."

¶ 17    At trial, S.C. testified that in January 2015, defendant began touching her in a "[sexual] way." On the first occasion, she and defendant were alone in his bedroom playing video games. At some point, he closed the door, blindfolded her, and started "touching" her "vagina" and "butt." He then "threw" her on the bed, removed her pants, and attempted to insert his penis in her vagina. S.C. ultimately pushed him away and left the room, but his penis contacted her vagina during the incident.

¶ 18    On the second occasion, S.C. was asleep in her bedroom when she awoke to defendant "standing over" her. Her cousin L.L. shared the room with S.C., and was asleep in a separate bed. Defendant partially removed S.C.'s pants and unsuccessfully attempted to insert his penis in her vagina. L.L. did not awaken. Defendant stopped because S.C. told him if he did not, she would "tell." He responded that if she did, Donmisty's child would be taken away. She was 11 years old at this time. Similarly, on a separate date, defendant again entered her bedroom while she slept and touched her "breasts." In another incident, when S.C. was again alone with defendant playing video games in his bedroom, he walked in front of her with his penis exposed and attempted to

"put it in [her] mouth." His penis contacted her tongue. S.C. believed this incident also occurred when she was 11 years old. Defendant stopped when S.C. pushed him away. On the final occasion, when S.C. was 12 years old, defendant entered her room while she slept and unsuccessfully attempted to remove her pants.

¶ 19    On cross-examination, S.C. testified that Donald, Carolyn, and Donmisty were at home during the first incident, but she did not call for help. She did not recall what time of year the first or second incidents occurred. Defendant touched her vagina during the second incident. L.L. was not in the room during the final incident.

¶ 20    Assistant State's Attorney Christina Kye testified that on May 3, 2016, she was assigned defendant's case and informed he was in custody. Kye met with defendant at the police station and Mirandized him, at which time he agreed to speak with her. She then interviewed defendant, and identified People's Exhibit No. 1 as an accurate video recording of a portion of the interview.

¶ 21    The state published People's Exhibit No. 1 to the court. In the video, which is included in the record on appeal, Kye enters the room, introduces herself as a state's attorney, and explains she does not represent defendant. He states he understands. Defendant initially claims he only had sexual contact with S.C. on one occasion, when he awoke to find S.C.'s mouth on his penis. He denies that he ever attempted to insert his penis in S.C.'s vagina, forced his penis into S.C.'s mouth, performed oral sex on S.C., or touched S.C.'s breasts or buttocks. He believes Carolyn told S.C. to make these allegations. Kye informs defendant that she was present when S.C. detailed the allegations in an interview, and that Kye also interviewed both Donmisty and Donald. Donmisty told Kye that defendant admitted he had a "sexual relationship" with S.C., and Donald stated that S.C. told him about defendant's conduct. Defendant eventually admits that he told Donmisty he

had a sexual relationship with S.C., including his penis touching S.C.'s vagina. He also admits that he touched S.C.'s breasts and buttocks, S.C. "put her mouth on" his penis, and he put his mouth on her vagina. Defendant states he "was put into that situation" and did not "initiate" the sexual relationship. He never threatened S.C. The sexual relationship started in March 2015 and continued until February 2016. In the last incident, S.C. performed oral sex on him and he performed oral sex on S.C.

¶ 22    On cross-examination, Kye testified that she did not ask defendant if he had any mental health diagnoses, required special education in school, took medication, or had consumed alcohol or drugs before the interview.

¶ 23    Donmisty testified that on April 6, 2016, she and defendant argued while he drove her home from work over a video she found on his cell phone. During the argument, he admitted that he had a sexual relationship with S.C. Donmisty grew angry and tried to hit defendant, who stopped the vehicle. She exited, and he drove away. A woman pulled over and allowed Donmisty to use her cell phone. Donmisty called defendant three times, who did not answer. She then walked to a police station. Eventually, she contacted Donald, who drove her home. When they arrived, there was a family meeting, after which Donald called the police. Defendant did not return home during the family meeting.

¶ 24    On cross-examination, Donmisty testified that she and defendant had marital problems before April 6, 2016. S.C. did not tell Donmisty about defendant's conduct before the family meeting.

¶ 25    The State entered a stipulation that if called, Jones would testify consistently with her testimony at the section 115-10 hearing. The State then entered the VSI video into evidence as

People's Exhibit No. 2. The court stated, "that will be admitted, and I will look at that." The VSI video was not played in open court.

¶ 26    Defendant moved for a directed verdict. The State asked that the court review the VSI video before ruling. The court agreed and stated, "I'm going to take a quick break. I'm going to take a look." Defendant did not object. When the trial resumed, the court granted defendant's motion in part and dismissed counts II and VII through X, but permitted counts I, III through VI, and XI through XIV to proceed.

¶ 27    Defendant testified on his own behalf. He explained that he had mental health diagnoses of paranoid schizophrenia, ADD, ADHD, manic depression, and OCD. He required special education in school. On April 6, 2016, Donmisty became angry during their drive "for no reason," then "jumped out" of the vehicle. He never told her he had sex with S.C. Defendant looked for Donmisty, then returned home.

¶ 28    On May 3, 2016, he went to the police station at Chicago police detective Alisa Gladney's request. He consumed alcohol and smoked cannabis beforehand. When he arrived, police officers placed him in an interrogation room, shackled him, and handcuffed him to the wall. Officers then interrogated him, and when he denied any misconduct with S.C., they became aggressive and accused him of lying. At some point, according to defendant, Gladney drew a firearm, cocked it, placed it to his head, and stated, "if you don't tell us the truth or if you don't say what we need you to say, then we're going to kill you." This "terrified" defendant, and he then said he had sex with S.C. because the officers "told [him] to." Officers also placed a bag over his head and struck him with a firearm.

¶ 29    On cross-examination, defendant denied he told Donmisty that he had sexual relations with S.C. After the officers beat and threatened him, he "did not say what [Gladney] wanted [him] to say," but "did say enough to incriminate" himself. When he later spoke to Dye, he believed she was his attorney.

¶ 30    In rebuttal, Gladney testified that during defendant's time at the police station, she did not threaten, restrain, or harm defendant, hold a firearm to his head, or demand he confess, and she did not see any other officer engage in such conduct.

¶ 31    Gladney identified People's Exhibit No. 4 as a DVD containing an accurate video recording of her interview with defendant. The State published portions of the video to the court.

¶ 32    The video, included in the record on appeal, shows defendant and Gladney in an interrogation room on May 3, 2016. Gladney Mirandizes defendant, who indicates he understands his rights. He states that he believes he is at the police station because he confessed to Donmisty that he had sexual relations with S.C. The incident with S.C. occurred in March or April 2015. He was "tipsy" and asleep in his bedroom when S.C. entered and performed oral sex on him while he slept. Initially he thought S.C. was Donmisty. When he realized it was S.C., he stopped her and told her to leave. He told Donmisty because the incident upset him, and he denied ever inappropriately touching S.C.

¶ 33    Gladney tells defendant that Donmisty stated she found pictures of Donita in his phone, which he denies. Gladney further explains that S.C. was interviewed and stated that "several things" happened between her and defendant. Defendant denies he blindfolded S.C., touched her private parts, or attempted to insert his penis in her vagina. The video does not depict Gladney, Dye, or anyone else restrain, threaten, or physically harm defendant.

¶ 34    On cross-examination, Gladney testified that she did not inquire about defendant's mental health history or education level, or ask if he consumed alcohol earlier that day. On redirect, she stated that she did not smell alcohol or cannabis in the room during the interview.

¶ 35    Following closing arguments, the court found defendant not guilty on counts IV through VI but guilty of counts I, III, and XI through XIV. In so finding, the court stated that it "was convinced beyond any doubt" that S.C.'s testimony was true, and described S.C.'s testimony as "corroborated by the other witnesses." The court continued that S.C. was "a lot more specific with [Jones]" than in court, but the VSI video "corroborated" and "lent credibility to" S.C.'s testimony. The court further stated, "There's nothing to lend any sort of credibility to [defendant's] allegations" regarding the officers' conduct during his interview.

¶ 36    The court denied defendant's motion for a new trial. The matter moved to sentencing, where, after a hearing, the court merged counts XI through XIV into count XI and sentenced defendant to nine years' imprisonment on count I for predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2014)), nine years' imprisonment on count III for predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2014)), and three years' imprisonment on count XI for aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2014)), all to run consecutively, for a total of 21 years' imprisonment. The court denied defendant's motion to reconsider sentence. Defendant timely appealed.

¶ 37                                              **ANALYSIS**

¶ 38    On appeal, defendant first argues that the court erred by admitting S.C.'s hearsay statements contained in the VSI video without first reviewing the video during the section 115-10 hearing.

¶ 39 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay statements are generally inadmissible unless they fall under an exception. *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). The relevant exception here, established by 725 ILCS 5/115-10 (West 2018), allows in relevant part for the admission of an out-of-court statement by a victim of sexual abuse under the age of 13 where, "The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability," and, relevant here, the victim testifies at trial. 725 ILCS 5/115-10(a), (b)(1), (2)(A) (West 2018).

¶ 40 We review a trial court's evidentiary decisions, including whether to admit statements pursuant section 115-10, for abuse of discretion. *People v. Stechly*, 225 Ill. 2d 246, 312 (2007). An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful or unreasonable," or where "no reasonable person would agree with the position adopted by the trial court." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). In a bench trial, the trial court, as factfinder, is trusted to ignore inadmissible evidence and base its findings only on admissible evidence, unless a party rebuts this presumption through an affirmative showing from the record. *People v. Naylor*, 229 Ill. 2d 584, 603-04 (2008).

¶ 41 The record shows, and the parties agree, that the circuit court did not view the VSI video before ruling the State could introduce it at trial. Defendant argues that the court therefore could not have properly weighed the content and circumstances of S.C.'s statements therein. The State argues that the summary document it submitted, along with Jones's testimony, sufficed for the court to make an informed ruling.

¶ 42    On this record, we find that the court did not abuse its discretion by admitting the VSI video into evidence following the section 115-10 hearing without first viewing the video. The statute specifies that the hearing must take place outside the presence of a jury, but this was a bench trial. Accordingly, we must presume the court ignored all inadmissible evidence, absent a positive showing from the record to the contrary. *Naylor*, 229 Ill. 2d at 603-04. Thus, here, we must presume that when the court reviewed the VSI video in chambers, it ignored any portions it found lacked sufficient indicia of reliability. See *People v. Balle*, 234 Ill. App. 3d 804, 816 (1992) (no error where trial court did not hold a section 115-10 hearing before considering certain evidence during a bench trial because the court was presumed to determine whether the evidence at issue had sufficient indicia of reliability before considering it). Defendant complains that the circumstances of the VSI were suggestive, but makes no affirmative showing from the record that the court failed to analyze the circumstances when reviewing the video, as the statute expressly requires. Therefore, the claim fails.

¶ 43    Additionally, even if we found the court erred in admitting this evidence, defendant would still not be entitled to relief. A defendant is not entitled to relief if the trial court's admission of hearsay evidence was harmless error. "The admission of hearsay evidence is harmless error where there is no reasonable probability that [the factfinder] would have acquitted the defendant absent the hearsay evidence." *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). Here, the remaining evidence was so overwhelming that the court likely would have found defendant guilty even without the VSI video. Defendant's statements to Gladney and Kye, S.C.'s trial testimony, and the testimony of Donmisty and Jones provide more than enough evidence from which to establish defendant's guilt beyond a reasonable doubt. We note that the court found S.C.'s testimony credible and

defendant's testimony incredible, and we must defer to this finding on review absent specific circumstances not present here. See *People v. Kite*, 153 Ill. 2d 40, 46 (1992). It follows that even if we were to find that the court erred, the error would be harmless.

¶ 44    Defendant next claims that the court violated his right to be present when it viewed the VSI video in chambers during the trial. The State argues that defendant forfeited this claim, and that the claim is meritless because the court's viewing of the VSI video was not a critical stage of the proceedings.

¶ 45    Defendant admits that he did not preserve this claim through a proper objection at trial and inclusion in a posttrial motion, but argues we may reach the issue on plain error review. See *People v. Staake*, 2017 IL 121755, ¶ 30. Plain error review is appropriate where a "clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "The first step of plain-error review is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Defendant argues the court's in-chambers viewing of the VSI video constituted second prong plain error.

¶ 46    Generally, a criminal defendant has the right under both the Illinois and United States Constitutions to be present at all critical stages of proceedings. *People v. Stroud*, 208 Ill. 2d 398, 404 (2004). This right is not absolute, and a defendant is only "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (citing

*Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). A defendant's absence, even from a critical stage, will not constitute error unless it "caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *People v. Lindsey*, 201 Ill. 2d 45, 57 (2002).

¶ 47    Defendant, citing *People v. Lucas*, 2019 IL App (1st) 160501, argues that the court's viewing of the VSI video was a critical stage because his absence prevented him from reviewing all the evidence against him before deciding whether to testify, a violation of his constitutional rights. In *Lucas*, the defendant was charged with driving under the influence (DUI), among other charges, and the trial court viewed a video of the traffic stop in chambers, which the record suggested defendant had never seen before. *Id.* ¶¶ 5-6. Defense counsel did not object. *Id.* The trial court stated that it relied on the video in part in finding defendant guilty. *Id.* ¶ 7. This court found that the trial court committed second prong plain error because the viewing of the video constituted a critical stage where the video "represented a significant portion of the evidence against" the defendant, and she never had the opportunity to review the video before deciding whether to testify. See *Id.* ¶¶ 14-15, 19, 21.

¶ 48    In recent cases involving a trial court's in-chambers review of evidence, this court has explained that where the defendant is "able to view all of the State's evidence against him at trial" it follows that "his decision regarding his right to testify [is] not impacted" by the procedure. See *People v. Richardson*, 2021 IL App (1st) 190821, ¶ 53; see also *People v. Martinez*, 2021 IL App (1st) 172097, ¶ 69. *Martinez* is instructive. There, we denied the defendant's claim that the trial court violated his right to be present by viewing a VSI video in chambers because the record unambiguously showed the trial court ensured the defendant viewed the VSI video before trial. *Martinez*, 2021 IL App (1st) 172097, ¶ 69. We distinguished *Lucas* on this basis, and emphasized

that because "the record [was] clear that defendant viewed the video at issue" and "was thus aware of all the evidence against him" before deciding whether to testify, "the court's private viewing of the video in chambers did not impact the fairness of defendant's trial or violate any of defendant's substantial constitutional rights." *Id.*

¶ 49    The parties here dispute whether the record demonstrates defendant viewed the VSI video. The record shows that the trial court did not view the video during the section 115-10 hearing, where defendant was present, and then viewed the video in chambers at trial. Thus, the record is clear defendant did not view the VSI video during in-court proceedings. The State points to defendant's pretrial statement that his attorneys "sped through" a video with him as proof he viewed the VSI video. But defendant did not specify to which video he was referring, and the evidence in this matter included two crucial videos: the VSI video, and the video of his statements to Gladney and Kye. Additionally, the record of pretrial proceedings shows defendant's attorneys twice requested to bring a laptop and DVDs into the prison to review evidence with defendant, but does not reveal what the DVDs contained or if these visits actually occurred. Finally, although the State created a summary of the VSI, which it provided to defense counsel, the record is unclear regarding whether defendant read the summary.

¶ 50    Initially, we note that though defense counsel did not object to the court's proposed viewing procedure during the trial, this does not constitute a waiver of defendant's right to be present. Such a waiver must be both knowing and voluntary, and the record shows the trial court never explained to defendant that he had a right to be present for the viewing. See *Lucas*, 2019 IL App (1st) 160501, ¶ 14 (citing *Lofton*, 194 Ill. 2d at 66).

¶ 51    Based on these facts, we find that the court erred by viewing the VSI video in chambers rather than playing it in open court in defendant's presence, and this error constituted second prong plain error because it denied defendant his constitutional right to be present at all critical stages of proceedings. Here, unlike in *Martinez*, the court failed to ensure defendant viewed the VSI video, and there is insufficient indication in the record for us to conclude that he ever saw it. On this understanding, the court's decision to view the VSI video in chambers denied defendant his right to be present at a critical stage because the VSI was a significant aspect of the evidence against him. The VSI video contained a pretrial statement by S.C. describing her allegations against defendant in detail. Her credibility was central to this case, as there were no other witnesses to the alleged abuse. Moreover, the court stated it considered the VSI video in arriving at its guilty finding, explaining that the VSI video bolstered S.C.'s credibility. It follows that this evidence was significant, and therefore defendant had a right to review it before deciding whether to testify, which the court denied him by viewing the VSI video only in chambers.

¶ 52    To avoid this result, the State argues that defendant knew generally of the video's contents based on Jones's testimony at the section 115-10 hearing and the State's written summary. But these accounts came from a State's witness and a state's attorney-created document. It is unclear whether the defendant even read the document. The evidence itself, which the trial court expressly considered in assessing credibility and finding defendant guilty, was the VSI video, not testimony about the VSI video or a written summary of S.C.'s statements at the VSI.

¶ 53    The State next argues that a court's in-chambers review of evidence the defendant has not seen does not necessarily impact the defendant's right to be present, citing *People v. Groebe*, 2019 IL App (1st) 180503. Indeed, in *Groebe*, this court rejected the defendant's right to be present

claim where the trial court reviewed a video of a DUI traffic stop in chambers, and the record did not indicate that the defendant saw the video. *Groebe*, 2019 IL App (1st) 180503, ¶¶ 46-52. But *Groebe* does not compel a different result here. In *Groebe*, the court found that the defendant failed to demonstrate the video evidence was significant, stating, "There is no argument or anything to suggest the trial court's procedure prejudiced defendant's ability to aid in her defense or to decide whether to testify." *Id.* ¶ 51-52. Conversely, here, defendant argues, and the record suggests, that the trial court's decision did impact defendant's underlying constitutional right because it denied him the chance to review significant evidence entered against him, as explained above. Additionally, in *Groebe*, we emphasized that there was no indication the trial court gave the video any weight in making its findings. *Id.* ¶ 52. Here, however, the court considered the video in its credibility determinations and guilty finding, stating that the video "corroborated" and "lent credibility to" S.C.'s testimony. *Groebe* is distinguishable from this matter on these bases.

¶ 54    The State further argues, citing *People v. Myles*, 2020 IL App (4th) 180652, and *People v. Young*, 2013 IL App (4th) 120228, that a trial court's viewing of a VSI video in chambers is not a critical stage of proceedings. Neither case suggests a different outcome here. First, in *Myles*, the defendant's testimony revealed he saw the video evidence at issue before deciding whether to testify, and the court rejected his right to be present claim accordingly. See *Myles*, 2020 IL App (4th) 180652, ¶ 62. *Young* is also inapposite because the *Young* court did not consider the issue presented here; instead it analyzed whether the trial court's viewing of the VSI video in chambers during the section 115-10 hearing constituted a critical stage. *Young*, 2013 IL App (4th) 120228, ¶¶ 7-8, 21-26. This analysis does not implicate a defendant's right to be present for the introduction of significant evidence against him at trial.

¶ 55     Finally, the State argues that the record demonstrates the court's in-chambers viewing of the VSI video was not a critical stage because the additional evidence against defendant was strong. But the strength of the other evidence does not impact our analysis here. The question we must resolve for this second prong plain error claim is whether the court's violation of defendant's right to be present impacted a fundamental right such that "it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565. As explained above, defendant has made this showing, and thus the court's error constitutes second prong plain error requiring reversal.

¶ 56                                         **CONCLUSION**

¶ 57     The court's viewing of the VSI video here constituted a critical stage of proceedings, and the court denied defendant his right to be present at that critical stage. This error constituted second prong plain error because it violated defendant's constitutional rights and rendered the trial process unfair. Accordingly, we vacate defendant's convictions, and remand for a new trial.[2]

¶ 58     In so holding, we note that a retrial does not pose double jeopardy concerns. The United States and Illinois constitutions allow retrial "when a conviction has been overturned because of an error in the trial proceedings," but prohibit retrial "if the evidence introduced at the initial trial was insufficient to sustain the conviction. [Citation.]" *People v. Drake*, 2019 IL 123734, ¶ 20. "Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction. [Citation.]" *Id.* ¶ 21. In determining

---

[2] We note that this practice is occurring far too often, and appeals such as this could be obviated if trial courts would simply review all non-testamentary evidence in open court and in the presence of the defendant. See, *e.g.*, *Richardson*, 2021 IL App (1st) 190821; *Martinez*, 2021 IL App (1st) 172097; *Groebe*, 2019 IL App (1st) 180503; *Lucas*, 2019 IL App (1st) 160501.

the sufficiency of the evidence, a reviewing court considers whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

¶ 59    Viewing the trial evidence in the light most favorable to the prosecution, a rational trier of fact could have easily found beyond a reasonable doubt that defendant was guilty of the charged offenses. Therefore, double jeopardy does not bar a new trial.

¶ 60    Vacated and remanded.