NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210408-U

NO. 4-21-0408

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 11, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DERRY CARPENTER, | ) | No. 19CF176 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's conviction of domestic battery because the trial court did not commit error, let alone plain error, by viewing a video exhibit without defendant being present, where the video had been previously admitted into evidence. Defendant's right to be present at all critical stages of the proceedings was not violated, because the trial court's viewing of the admitted video in chambers was not a "proceeding."

¶ 2    Following a bench trial, defendant, Derry Carpenter, was found guilty of two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2018)). The trial court sentenced defendant to eight years' incarceration in the Illinois Department of Corrections, consecutive to a one-year sentence stemming from a conviction for criminal damage to property in a separate case. Defendant appeals, arguing that his right to be present at all critical stages of the proceedings was violated when the trial court viewed video evidence alone in chambers. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In July 2019, defendant was charged with two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2018)), alleging that he struck Alyssa Lewis while at their home on July 6, 2019. Defendant requested a bench trial, which commenced on July 20, 2020.

¶ 5            At trial, Lewis testified that in July 2019, she lived in a house in Pontiac, Illinois, with defendant and defendant's friends, Will and Annie. At that time, Lewis was in a relationship with defendant, which had begun in April 2019. Lewis explained that, on or about July 7, 2019, she, defendant, Will, and Annie had been drinking beer. Lewis had about six beers throughout the day, but she stated that she was not intoxicated. She did not know how many beers defendant and his friends had consumed. Lewis testified that, at about 5 p.m., she was cooking quesadillas when defendant received a text message "about his friends talking negatively." Defendant showed her the text message, but she "didn't show any interest in it" and "acted like [it was] just not that big of a deal." According to Lewis, defendant became angry because it seemed "like [she] wasn't there to support him." Lewis testified that defendant picked up a quesadilla from the pan and threw it at her so that food was in her hair and on her shirt. Defendant then grabbed a nearby fork and scraped it across her face. Lewis testified that she ran to a park across the street to call the police, then returned to the house and waited for about five minutes before they arrived. Lewis noted that she spoke to the police when they arrived and that she was still crying when she did so.

¶ 6            Lewis testified that a few days after the incident, she went to the state's attorney's office and filled out a complaint refusal form. She explained that she filled out the form because all of defendant's friends, including "[e]verybody at the house," told her to do so. Additionally, people in town were threatening that they would "jump" her if she did not refuse to press charges

against defendant. Lewis further noted that, because she lived with defendant and had no other place to live, she feared she would "be homeless" if defendant was arrested. She explained, however, that Will and Annie told her that she would have a place to stay if she filled out a complaint refusal and wrote that she "was too drunk to remember what happened." Lewis testified that, pursuant to that understanding, she filled out the form.

¶ 7    Corporal Alan Doran of the Pontiac Police Department testified that on July 6, 2019, he responded to a domestic battery call at 712 West Washington Street in Pontiac. When he arrived, Corporal Jeffrey Muir was already at the scene and had detained defendant. Thus, Doran spoke with Lewis to obtain her sequence of events. According to Doran, Lewis was very upset and crying, but she showed no obvious signs of intoxication and was cooperative and direct when answering his questions. Doran noticed three raised scratch marks underneath both of Lewis's eyes and food in Lewis's hair. Doran testified that Lewis told him that the scratch was caused by a fork, and the food was from defendant slapping a plate of food out of her hand. Doran explained that he took photographs of Lewis and her injuries, at which point the State showed Doran two photographs. Doran identified both photographs as ones he took of Lewis, and he noted that they accurately depicted Lewis as he observed her on July 6, 2019. The photographs showed a scratch mark under Lewis's eye and food in her hair.

¶ 8    Doran also testified that he recorded Lewis's statement by speaking with her in front of his squad car so that his vehicle's camera would capture the conversation. That video was not played in open court at trial, but it was provided to this court. In the video, Doran directed Lewis to the front of his vehicle and obtained Lewis's consent to be recorded while she provided her statement. Doran then asked Lewis to explain what happened. Lewis told Doran that, while she was cooking, defendant was texting with several friends who were angry with

defendant and Lewis about an incident that occurred the prior week. Lewis explained that defendant told her that he was texting his friends "for" her and began accusing her of not "hav[ing] his back." Lewis stated that defendant then hit the food she was cooking off the stove so that it went "all over" her hair and clothes, scraped a fork across her face, and hit her in the face with an open hand.

¶ 9 The prosecutor showed Doran People's Exhibit 3, a DVD containing Lewis's recorded statement. Doran identified the exhibit and explained that he had downloaded the recording from his squad car camera, watched it, and provided it to the State. Doran testified that the video was a true and accurate copy of his interview with Lewis.

¶ 10 The State offered People's Exhibit 3 into evidence. The court asked if there was any objection, and defendant's counsel answered, "No." The court admitted the exhibit, and the prosecutor stated, "If it pleases Your Honor, I can admit it; and you can watch it in chambers. I don't have to play it today." The court asked if there was any objection, and defendant's counsel answered, "No." The court then stated, "That's fine. I'll view it in chambers if there's no objection." Following Doran's testimony, the court continued the bench trial until March 29, 2021. In the interim, the court reviewed People's Exhibit 3 alone in chambers.

¶ 11 When the trial resumed, the State called Corporal Jeffrey Muir of the Pontiac Police Department. Muir testified that, on the evening of July 6, 2019, he responded to a physical domestic dispute at 712 West Washington Street. Upon arriving, he observed Lewis outside the residence, yelling. Muir explained that he approached Lewis, who was very upset but showed no signs of intoxication. He testified that he noticed a scratch on her cheek, and when he asked what was going on, Lewis described the incident that took place. Muir then went inside the residence and saw that it was in disarray with broken things, including glass, on the floor. Defendant

emerged from a back room and approached Muir. According to Muir, he smelled a faint odor of alcohol about defendant and noticed that defendant was showing signs of intoxication. When Muir asked defendant what happened, defendant told him that he and Lewis "were in an argument." Muir testified that defendant then "admitted to striking [Lewis] in the face," but "denied having a fork in his hand." Muir then placed defendant under arrest for domestic battery, and while handcuffing defendant, he noticed blood coming from a scratch on defendant's hand.

¶ 12 Defendant testified in his own defense. He explained that on the night of the incident, he had been "texting another female," which made Lewis angry. As a result, he and Lewis yelled at each other for 20 to 30 minutes. According to defendant, during the argument, he accidentally knocked food onto the ground, and after he picked it up and placed it on his plate, Lewis slapped the plate out of his hand. He stated that his hand was cut as a result. He then went into a back room while Lewis "stormed off." Defendant testified that he never struck Lewis, but on cross-examination, he acknowledged that he remembered telling officers that he had done so.

¶ 13 Defendant then rested his case. Following closing arguments, the trial court explained that "to some extent this case does boil down to credibility." The court found that, although Lewis completed a complaint refusal form, her recantation was "somewhat suspect," given her testimony that she feared that she would not have a place to live if she did not sign it. The court also found that what Lewis "told the police on the day of the incident [was] consistent with the officer[s'] testimony *** as well as the photographs." Specifically, the court found that Doran and Muir consistently testified that Lewis told them defendant threw food at her and scratched her face with a fork. The court noted that this was also corroborated by the photographs showing food in Lewis's hair and on her shirt. The court further found that defendant was not a credible witness because he was evasive and argumentative. As a result, the

court found defendant guilty on both domestic battery counts. The second domestic battery count merged into the first. The trial court sentenced defendant to eight years' imprisonment, which was to be consecutive to a one-year sentence stemming from a criminal damage conviction in a separate case. This appeal followed.

¶ 14                                            II. ANALYSIS

¶ 15          Defendant argues that, by viewing the video of Lewis's statement to Doran alone in chambers, the trial court violated his right to be present at all critical stages of the proceedings. Defendant acknowledges that this issue is unpreserved because his counsel raised no objection in the trial court, but he argues that it is reviewable under the plain-error doctrine.

¶ 16          Under the plain-error doctrine, a reviewing court may consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Myles*, 2020 IL App (4th) 180652, ¶ 57. The first step in a plain-error analysis is to determine whether an error occurred. *Myles*, 2020 IL App (4th) 180652, ¶ 57.

¶ 17          Generally, both the United States and Illinois Constitutions afford criminal defendants the right to be present at all critical stages of the proceedings, from arraignment to sentencing. *Myles*, 2020 IL App (4th) 180652, ¶ 59. However, under the due process clause of the fourteenth amendment, a defendant's right to be present is violated only when his or her absence results in the denial of a fair and just trial. *Myles*, 2020 IL App (4th) 180652, ¶ 59. The relevant consideration is whether the defendant's presence at the proceeding would have

contributed to his or her opportunity to defend against the charges. *Myles*, 2020 IL App (4th) 180652, ¶ 59. Accordingly, a defendant's presence is not required when his or her presence would be useless or where the benefit would be " ' but a shadow.' " *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934)). The analysis turns on the nature of the hearing from which the defendant has been excluded. *Lofton*, 194 Ill. 2d at 67-68. Whether the defendant's exclusion was just must be determined in light of the whole record. *Lofton*, 194 Ill. 2d at 67. A defendant's attorney has no power to waive his or her client's right to be present. *Lofton*, 194 Ill. 2d at 66. We review *de novo* whether a stage of trial is a "critical stage" (*People v. Young*, 2013 IL App (4th) 120228, ¶ 23) and whether defendant's right to be present has been denied (*Myles*, 2020 IL App (4th) 180652, ¶ 59).

¶ 18        Defendant argues that, because the presentation of evidence at trial is a critical stage of the proceeding and because there was nothing in the record indicating that he had ever seen the video of Lewis's statement to Doran, the trial court violated his right to be present by viewing the video in chambers without him. He asserts that, by doing so, the trial court deprived him of the opportunity to confront the evidence against him and hindered his ability to decide whether to testify in his own defense, since he was not aware of all of the State's evidence against him. In making this argument, defendant relies on *People v. Lucas*, 2019 IL App (1st) 160501, and *People v. Flagg*, 2021 IL App (1st) 191692-U.

¶ 19        In *Lucas*, the defendant was charged with, *inter alia*, operating an unsafe vehicle, driving under the influence of alcohol, and negligent driving. 2019 IL App (1st) 160501, ¶ 4. At the defendant's bench trial, the parties stipulated to the authenticity of a video of the defendant's traffic stop, and immediately thereafter, the State sought to publish the video for the court. *Lucas*, 2019 IL App (1st) 160501, ¶ 5. The judge explained to the defendant that, because there

was no video capability in the courtroom, he would watch the video in chambers with only the attorneys present, and neither attorney would have the opportunity to ask questions or make comments. *Lucas*, 2019 IL App (1st) 160501, ¶ 5. Once the judge confirmed that the defendant understood, the judge watched the video in chambers with the attorneys, and upon returning, the video was admitted into evidence. *Lucas*, 2019 IL App (1st) 160501, ¶ 6. The court ultimately found the defendant guilty, and in doing so, the court "explicitly stated it relied on the video" and the arresting officer's testimony. *Lucas*, 2019 IL App (1st) 160501, ¶ 7.

¶ 20    The defendant appealed, arguing that, because she was not present while the court viewed the video of her traffic stop, the trial court committed second-prong plain error and violated her right to due process. *Lucas*, 2019 IL App (1st) 160501, ¶ 10. The appellate court agreed, concluding that the defendant's "absence from the video viewing affected the trial's fairness." *Lucas*, 2019 IL App (1st) 160501, ¶ 14. The court explained that the defendant's right to be present was implicated because the "presentation of evidence at trial is undoubtedly a critical stage of the proceeding." *Lucas*, 2019 IL App (1st) 160501, ¶ 15. Moreover, "the video of the traffic stop involved a significant portion of the evidence" against her, especially where the court relied on the video in finding the defendant guilty. *Lucas*, 2019 IL App (1st) 160501, ¶ 15. Because nothing in the record indicated that the defendant had ever seen the video, and because the trial judge did not allow the defendant to be present when he viewed it, the appellate court determined that the defendant was not afforded the opportunity to confront the evidence against her and aid in her defense. *Lucas*, 2019 IL App (1st) 160501, ¶¶ 14, 16. Particularly, the appellate court noted, because the defendant was not aware of all of the State's evidence against her, she was unable to make an informed decision about whether she should testify. *Lucas*, 2019 IL App (1st) 160501, ¶ 19. Accordingly, the appellate court concluded that the trial court's

- 8 -

viewing of the video without the defendant present constituted second-prong plain error. *Lucas*, 2019 IL App (1st) 160501, ¶ 21.

¶ 21     In *Flagg*, the First District extended *Lucas*'s rationale to the trial court's viewing of a video outside the defendant's presence after the video had been admitted into evidence. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 2. There, the defendant was charged with several sex crimes against a minor victim. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 4. The State tendered a DVD to the defendant's counsel containing a video of the victim's "Victim Sensitive Interview," during which the victim disclosed to a child forensic interviewing specialist that the defendant engaged in sexual acts against her and detailed her allegations. *Flagg*, 2021 IL App (1st) 191692-U, ¶¶ 5, 8. However, the record did not indicate that the defendant ever saw the video. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 51. At trial, the victim testified to the defendant's conduct against her, and later, the State offered the victim's video interview into evidence. *Flagg*, 2021 IL App (1st) 191692-U, ¶¶ 17-18, 25. The court admitted the video, and during a break, without objection from the defendant's counsel, the court viewed it outside the defendant's presence. *Flagg*, 2021 IL App (1st) 191692-U, ¶¶ 25-26. At the conclusion of trial, the court found the defendant guilty of several offenses, noting that the video "corroborated" and "lent credibility" to the victim's testimony. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 35.

¶ 22     The defendant appealed, arguing that the court violated his right to be present when, after entering the video of the victim's interview into evidence, the court viewed it in chambers without him. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 44. The First District agreed. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 57. The court explained that the video constituted a significant aspect of the evidence against the defendant, as the video contained the victim's pretrial allegations against him, the victim's credibility was central to the case, and the trial court

- 9 -

explicitly found that the video bolstered the victim's credibility at trial. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 51. The court explained that, therefore, the defendant had a right to review the video before deciding whether to testify. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 51. The court determined that, since the record did not definitively show that the defendant had ever viewed the video, the court denied him that right by viewing it without him. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 51. The appellate court thus concluded that the trial court's viewing of the video constituted a critical stage of the proceedings, such that, by viewing the video alone, the trial court denied the defendant his right to be present at that critical stage, which amounted to second-prong plain error. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 57.

¶ 23       Defendant's reliance on *Lucas* and *Flagg* is unavailing. *Lucas* is distinguishable. This Court has drawn a distinction between cases like *Lucas*, where a trial court views a video without the defendant present *before* that video has been admitted into evidence, and cases like *Flagg*, where the trial court does so *after* it has been admitted into evidence. *See People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 73 (citing *People v. Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31) ("The appellate court has distinguished *Lucas* from a case in which the circuit court viewed a video outside the defendant's presence *after* admitting the video in evidence." (Emphasis in original.)). Here, unlike *Lucas*, the trial court viewed the video of Lewis's statement to Doran after it had been admitted into evidence. Therefore, *Lucas* does not assist defendant.

¶ 24       Although defendant's case is procedurally analogous to *Flagg*, we have rejected *Flagg*'s holding. Specifically, we have held that a trial judge's viewing and consideration of a video that has been admitted into evidence does not constitute a "hearing" or "proceeding" that

- 10 -

implicates a defendant's right to be present at all critical stages of the proceedings. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 81, 83-84.

¶ 25    In *Aquisto*, the defendant was charged with several drug offenses. 2022 IL App (4th) 200081, ¶ 10. At the defendant's bench trial, the State offered into evidence a video recording of a statement the defendant made to the police after his arrest, in which he admitted to manufacturing methamphetamine at a residence while two children were inside. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 35-36. The defendant's counsel did not object to the video's admission, and when the judge asked if there was any objection to her viewing it outside the courtroom, defendant's counsel answered, "No." *Aquisto*, 2022 IL App (4th) 200081, ¶ 35. After viewing the video, the trial court found the defendant guilty of the charged offenses. *Aquisto*, 2022 IL App (4th) 200081, ¶ 38. The defendant appealed, arguing that both *Lucas* and *Flagg* supported the conclusion that the trial court committed plain error by viewing the video exhibit of his interview outside his presence. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 72-74.

¶ 26    We rejected the defendant's argument. *Aquisto*, 2022 IL App (4th) 200081, ¶ 84. We first distinguished *Lucas* because, unlike *Lucas*, the court viewed the video only after it had been admitted into evidence. *Aquisto*, 2022 IL App (4th) 200081, ¶ 73. We then rejected the First District's reasoning in *Flagg*, noting that, because admitted video evidence is comparable to admitted documentary evidence, *Flagg*'s logic would lead to the "implausible conclusion" that a defendant's right to be present would be violated if a judge read an admitted document alone in chambers if there was no affirmative disclosure in the record that the defendant had personally read that document first. *Aquisto*, 2022 IL App (4th) 200081, ¶ 83. Moreover, because there is little difference between admitted video evidence and admitted documentary evidence, a defendant's presence in chambers while the judge reviews an admitted video would not

- 11 -

contribute to the defendant's ability to mount a defense any more than if the defendant was present while the judge reviewed documentary evidence. *Aquisto*, 2022 IL App (4th) 200081, ¶ 81. Accordingly, we concluded that a judge's viewing and scrutiny of an admitted video in chambers is not a "hearing" or "proceeding" that implicates a defendant's right to be present. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 81, 83. We thus held that, because the trial judge merely viewed a video that had already been admitted into evidence, that viewing did not violate the defendant's right to be present at all critical stages of the proceeding. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 83-84.

¶ 27         *Aquisto* is dispositive. Like *Aquisto*, after Doran testified that People's Exhibit 3 was a true and accurate copy of his interview with Lewis on July 6, 2019, the State offered it into evidence. The court asked if there was any objection, and defendant's counsel answered, "No." The court then admitted the exhibit. Thereafter, the court viewed the video without defendant present and subsequently found defendant guilty. Although the court viewed the video alone, without objection from defendant's counsel, that viewing did not constitute a "hearing" or "proceeding" but merely amounted to the judge's scrutiny of already admitted evidence. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 83-84. Accordingly, the court's viewing did not implicate defendant's right to be present at all critical stages of the proceedings. *Aquisto*, 2022 IL App (4th) 200081, ¶¶ 83-84; see also *Young*, 2013 IL App (4th) 120228, ¶ 24 (stating the critical stage was portion of hearing where defendant had opportunity to argue that videos were inadmissible as evidence, not when court viewed videos after they had been admitted into evidence). We thus hold that the court's viewing of the admitted video did not violate defendant's right to be present at all critical stages of the proceeding. Accordingly, we find no error, and as such, there can be no plain error.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.