2022 IL App (4th) 200081

NO. 4-20-0081

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 24, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| BRANDON AQUISTO, | ) | No. 18CF166 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Harris and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        In a bench trial, the circuit court of Livingston County found the defendant, Brandon Aquisto, guilty of methamphetamine-related offenses. The court sentenced him to concurrent terms of 25 years' imprisonment for aggravated participation in methamphetamine manufacturing (720 ILCS 646/15(b)(1)(B) (West 2018)) and 7 years' imprisonment for unlawful delivery of methamphetamine (*id.* § 55(a)(2)(A)). He appeals on five grounds.

¶ 2        First, defendant challenges the chain of custody for People's exhibit No. 1, a substance that the crime laboratory found to test positive for the presence of methamphetamine. He objects to gaps in the proof linking him to this incriminating exhibit. Through his defense counsel, however, defendant affirmatively stated to the circuit court that he had no objection to the admission of People's exhibit No. 1. Consequently, defendant is estopped from challenging the chain of custody—which, we find, is not so deficient that his possession of People's exhibit No. 1

is unproven as a matter of law. Defendant contends that defense counsel rendered ineffective assistance by not objecting to deficiencies in the chain of custody. Because defendant, however, fails to show that he suffered prejudice from the omission of such an objection, his claim of ineffective assistance fails.

¶ 3 Second, defendant contends that the circuit court erred by denying his motion for the suppression of evidence. But the search warrant that defendant challenged in his motion was supported by probable cause. We conclude, *de novo*, that a controlled purchase of methamphetamine from defendant in the backyard of a house designated as his "parole" residence created probable cause to search the house. Therefore, we find no error in the denial of his motion for the suppression of evidence.

¶ 4 Third, defendant claims that by watching, outside his presence, the postarrest video of his interrogation by the police, the circuit court denied him his constitutional right to be present at a critical stage of the proceeding. It is true that, after admitting the video in evidence, the circuit court watched the video in chambers, in the presence of the attorneys but outside defendant's presence. Defense counsel, however, did not object to defendant's absence from the viewing of the video. Defendant makes a less than compelling argument that the viewing of this admitted exhibit was a "proceeding," let alone that the fairness of his trial depended on his being present at the viewing. Thus, we find no clear or obvious error. Absent an error that is clear or obvious, the doctrine of plain error does not avert the issue's forfeiture resulting from (1) the lack of a contemporaneous objection and (2) the failure to reiterate the objection in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Schrems*, 224 Ill. App. 3d 988, 994 (1992).

¶ 5 Fourth, defendant accuses his defense counsel of rendering ineffective assistance by failing to raise an entrapment defense to the charge of unlawful delivery of methamphetamine.

Because defendant, however, denied the charge of unlawfully delivering methamphetamine—and for all that appears in the record, persisted in his denial—the affirmative defense of entrapment was legally unavailable. Defense counsel was correct, then, to refrain from raising an entrapment theory. Effective assistance does not entail raising legally unmeritorious theories.

¶ 6 Fifth, defendant requests us to reduce his sentence or, alternatively, to remand his case for a new sentencing hearing for the following reasons: (1) the circuit court subjected him to a double enhancement by treating his receipt of compensation from a confidential source (Bryan Cox) as an aggravating factor; (2) the court failed to consider, as a mitigating factor, that Cox had induced defendant to commit unlawful delivery of methamphetamine; (3) the court failed to treat defendant's drug addiction as a mitigating factor; (4) the court imposed a trial tax; and (5) the 25-year prison sentence for aggravated participation in methamphetamine manufacturing was too severe, considering the seriousness of the offense and the evidence in mitigation. Acknowledging that he has procedurally forfeited the first four contentions by omitting them in his postsentence motion, defendant attributes the forfeiture to ineffective assistance of counsel, and alternatively, he invokes the doctrine of plain error. These claims of ineffective assistance and plain error fail because of either a lack of prejudice or a lack of a clear or obvious error. We find no abuse of discretion in the sentence of 25 years' imprisonment.

¶ 7 Therefore, we affirm the judgment.

¶ 8 I. BACKGROUND

¶ 9 A. The Charges

¶ 10 The State charged defendant with count I, aggravated participation in methamphetamine manufacturing (720 ILCS 646/15(b)(1)(B) (West 2018)); count II, methamphetamine-related child endangerment (*id.* § 50(a)(1)); count III, possession of

methamphetamine-manufacturing materials (*id.* § 30(a)); count IV, unlawful delivery of methamphetamine (*id.* § 55(a)(2)(A)); and count V, unlawful use of property (*id.* § 35(b)).

¶ 11                                    B. The Complaint for a Search Warrant

¶ 12        On June 5, 2018, Inspector Leland Brooke signed a complaint for a search warrant. In his complaint, he averred as follows. He was a deputy in the Livingston County sheriff's department and was assigned to be an inspector with the department's proactive unit. On June 4, 2018, around 1:51 p.m., Brooke had a text-message conversation with confidential source No. 99-14, who claimed he could buy one gram of methamphetamine from defendant for $70 at 838 South Locust Street in Pontiac, Illinois. Defendant had told the confidential source that he had been making methamphetamine for the past two days. Defendant had even sent the confidential source photographs of the methamphetamine "in the production liquid form."

¶ 13        On June 4, 2018, at 11:20 p.m., Brooke met with the confidential source (Brooke continued in his complaint), and they made preparations for a controlled purchase of methamphetamine from defendant. Brooke searched the confidential source and found no contraband on his person. He gave the confidential source $70 in prerecorded currency. Then he drove the confidential source to the vicinity of the 900 block of South Locust Street.

¶ 14        Keeping the confidential source under surveillance, Brooke and another police officer, Zachary Benning, observed the following. At approximately 12:01 a.m. on June 5, 2018, the confidential source got out of Brooke's undercover vehicle and walked directly to 838 South Locust Street. South of that residence, on the sidewalk, the confidential source met a man, later identified as defendant. The confidential source and the man walked to the residence at 838 South Locust Street. Then they walked around to the north side of the residence. At about 12:09 a.m., the confidential source walked away from 838 South Locust Street, heading south on Locust Street,

toward Brooke. At approximately 12:12 a.m., the confidential source arrived back at the undercover vehicle, where he handed Brooke a bag containing "approximately 0.2 grams of powder methamphetamine." At approximately 12:20 a.m., the confidential source was searched, "with negative results." The residence where the controlled purchase had taken place, 838 South Locust Street, was "the parole address listed for [defendant]."

¶ 15    After the controlled purchase (Brooke continued in his complaint for a search warrant), the confidential source told him what had happened. According to this debriefing, the confidential source walked north on Locust Street, and defendant whistled to him. He walked up to defendant, who had the confidential source follow him around to the back of the house. There defendant told the confidential source he had only 30 dollars' worth, and he asked the confidential source if he had $30. The confidential source handed defendant $30, and defendant handed him the methamphetamine. Defendant explained to the confidential source how to use the methamphetamine since the confidential source had never used it before, and defendant advised him to swallow the methamphetamine if the police stopped him. The confidential source then walked back to Brooke.

¶ 16    On the basis of those facts, Brooke requested a warrant to search 838 South Locust Street for methamphetamine and for any equipment and currency associated with the manufacture of methamphetamine. The circuit court issued the requested search warrant.

¶ 17                C. The Search of 838 South Locust Street

¶ 18    On June 6, 2018, the police executed the search warrant. The residence that they searched, 838 South Locust Street, was a house that defendant shared with his sister and her spouse. Defendant's nieces, who were born on July 2, 2009, and February 25, 2011, also lived in the house and were present at the time of the search. Defendant's bedroom was in the basement,

where the police found a paystub with defendant's name on it as well as supplies and equipment for manufacturing methamphetamine. When the police opened a bag, wisps of vapor began wafting upward, toward the children's bedroom.

¶ 19                              D. The Chemical Testing of Substances

¶ 20                                    1. *People's Exhibit No. 1*

¶ 21          In his testimony in the bench trial, Brooke testified that, after the controlled purchase at 838 South Locust Street, the confidential source, Cox, brought back to him, along with $40 in change, "a little pill bag or a jeweler bag *** with a white powdery substance" in it. Brooke further testified that he took the pill bag of powder to the sheriff's department and that, after field-testing the powder, he sealed the pill bag of powder into an evidence bag, which he locked into the evidence vault. He identified People's exhibit No. 1 as the sealed evidence bag. Brooke believed that only he, "Inspector Benning, Detectives Rork [and] DeMoss, [and] Lieutenant Hamilton" had access to the evidence vault. As far as Brooke knew, People's exhibit No. 1 "remained in that sealed condition in that locked vault until such time that it was transported to the Illinois State Police crime lab."

¶ 22          The prosecutor asked Brooke:

          "Q. How do you know, again, how do you know that[ ] [People's exhibit No. 1 is] the exact same bag?

          A. Because it's my handwriting on the back and my initials, signature on the back with the date and my badge number."

¶ 23          Michelle Dierker, a forensic scientist with the Illinois State Police, testified that, when People's exhibit No. 1 arrived at the laboratory, someone other than her signed it in. Dierker in turn "sign[ed] it over from another scientist." The prosecutor asked Dierker:

"Q. Now, if you recall, if you can tell from that mark or that packaging, when you received it from the other forensic scientist who checked it in, do you recall, was it in a sealed condition?

A. Yes, it was.

Q. And it was sealed in the bag that it's, this plastic bag that it's contained in. Is that correct?

A. Correct. At the time that I received it, the only thing missing would be the blue evidence tape along the bottom of the plastic bag because that's evidence tape that I put there as I resealed the evidence after my analysis."

¶ 24 After performing chemical tests on the substance in People's exhibit No. 1, Dierker concluded that "the tenth of a gram of white powder substance in this exhibit was, in fact, positive for the presence of methamphetamine."

¶ 25 The prosecutor then offered People's exhibit No. 1 in evidence. The circuit court asked defense counsel:

"Any objection to [the] admission of People's 1?

MR. RIPLEY [(DEFENSE COUNSEL)]: No.

THE COURT: People's 1 is admitted."

¶ 26                              2. *People's Exhibit No. 6*

¶ 27 A bottle in defendant's basement bedroom contained liquid. The police poured 10 milliliters of the liquid into a vial and sent the vial, People's exhibit No. 6, to the laboratory for chemical testing. A forensic scientist, Joni Little, testified that, when she bubbled hydrogen chloride through the liquid (a step in the methamphetamine-manufacturing process), the liquid

turned into crystals, which tested positive for methamphetamine. Thus, Little opined, the liquid in People's exhibit No. 6 was methamphetamine that had not yet been crystallized.

¶ 28                                    E. The Unsuccessful Plea Negotiations

¶ 29            On May 30, 2019, at the beginning of the bench trial, the prosecutor reminded the circuit court, "I don't know if Your Honor was planning on the pretrial admonitions regarding offers." The court admonished defendant, explaining to him the minimum and maximum sentences for the five counts of the information. Then the court inquired if there had been any plea negotiations. The prosecutor answered that "[t]he original offer *** was 23 years in the Illinois Department of Corrections" and that the last offer was 18 years. Defense counsel informed the court that defendant had responded with a counteroffer, which the State had rejected.

¶ 30                                    F. The Testimony of the Confidential Source

¶ 31            The confidential source, Bryan Cox, testified that, in return for cash payments from the police, he had done about 60 controlled purchases over the years. Although Cox had known defendant since eighth grade and although they had been good friends, he came to regard defendant as another target for a controlled purchase. Cox came to this realization, according to his testimony, after defendant requested that he buy Sudafed for him. Initially, Cox thought that defendant wanted the Sudafed to treat a cold (so Cox represented in his testimony), but somehow Cox found out that defendant really wanted the Sudafed for making methamphetamine. It appears, from Cox's testimony, that defendant made it known on Facebook that he had methamphetamine to sell. The prosecutor asked Cox:

    "Q. Now, you indicated that you had never bought from [defendant] before?

    A. No, I have not.

Q. But you figured out that you could buy from him this time. Is that correct?

A. Yes. Because he said, he had something on Facebook."

¶ 32 Cox approached Brooke, suggesting that he could buy methamphetamine from defendant. For his services on this occasion, the police promised to pay Cox $100 or so—he did not remember the amount. Arrangements were made for the controlled purchase. Surveillance was set up. When Cox approached defendant on South Locust Street, Benning was parked across the street in a pickup truck, and the headlights of the truck came on. (According to Benning's testimony, the lights in the cab of the truck came on. Benning testified that it was a new truck and that he had not learned yet how to control the interior lights.) Uneasy at the lights from the truck across the street, defendant urged Cox to come into the backyard of 838 South Locust Street, where they could transact their business in a more secluded location. In the backyard, defendant told Cox that he had only $30 worth of methamphetamine. Of the $70 in cash that Brooke had given him, Cox paid defendant $30. Then Cox brought back to Brooke the remaining $40 and the methamphetamine.

¶ 33 G. The Postarrest Video of Defendant's Statement to the Police

¶ 34 After the controlled purchase, the police arrested defendant. In the police station, after reading defendant his rights, Brooke interviewed him. People's exhibit No. 4 was a video recording of the statement that defendant chose to make.

¶ 35 In the bench trial, Brooke testified that People's exhibit No. 4 was "a fair and accurate depiction of [his] conversation with the Defendant after he had been arrested." After this authentication of the exhibit by Brooke, the prosecutor offered the exhibit in evidence:

"MR. YEDINAK [(PROSECUTOR)]: Your Honor, I'd ask that People's Number 4 be admitted into evidence.

THE COURT: Any objection?

MR. RIPLEY: No.

MR. YEDINAK: We would ask Your Honor to review this. I know we are out of time for the day, and that actually concludes my direct examination of Deputy Brooke. I don't know how Your Honor wishes to proceed.

THE COURT: Okay. So first of all, you want me to view that. Any objection to me viewing the interview of the Defendant outside of the courtroom?

MR. RIPLEY: No."

¶ 36　　In People's exhibit No. 4, defendant admitted manufacturing methamphetamine four times in the basement of 838 South Locust Street while the two children, his nieces, were in the house. He insisted, however, that it had been exclusively for his own personal consumption that he had manufactured the methamphetamine. He denied delivering methamphetamine to anyone, including Cox.

¶ 37　　　　　　　H. The Findings of Guilt and the Sentence

¶ 38　　The circuit court found defendant guilty of all five counts of the information, but the court held that counts II, III, and V merged into count I.

¶ 39　　Defendant did not move for a new trial.

¶ 40　　On October 31, 2019, in the sentencing hearing, defendant made a statement in allocution. The circuit court responded, "I think you've accepted responsibility here although we did have a full-blown trial. You are entitled to maintain your innocence. But we did have a full-blown trial on this case ***."

¶ 41         The circuit court found the following factors in aggravation. First, defendant had "been offered treatment on several occasions," and he now was 30 years old—no longer a juvenile—and his drug problem was getting worse instead of better. The court noted, "It did come out during the trial that, you know, you learned this, how to attempt to cook meth while you were in Decatur which is the place your mom said she was trying to get you to sober up ***." Second, defendant received compensation for his delivery of methamphetamine to Cox. The court remarked to defendant:

> "You received some money, and I think you actually got some of the Sudafed or whatever it was that you were using to cook the meth. So you did receive compensation for committing the offense. That's not inherent in the offense itself, albeit minimal. It wasn't that much. But it is a factor in aggravation."

Third, defendant had a considerable criminal record, which the court deemed a "very strong factor in aggravation." Fourth, another "very strong factor in aggravation," in the court's view, was that defendant committed the present offense after being "paroled on January [20, 2018]." "So[,] there are very, very strong aggravating factors in this case," the court opined, "especially when you consider the totality of the circumstances and the seriousness of the offense."

¶ 42         Looking at the other side of the ledger, the circuit court agreed with defense counsel that defendant "ha[d] no violent history in [his] past." Even so, the court commented to defendant, "You are a threat to society. I mean, not only to society but your nieces and to your sister and her family. You are a very real threat."

¶ 43         The circuit court concluded:

> "So I can't imagine a situation where you would receive a sentence anywhere near what [you're] asking for [(eight years' imprisonment)], particularly

again since you were on parole at the time of these offenses. So I do think the State's recommendation is a reasonable recommendation, and I am going to sentence you to 25 years in the Department of Corrections on Count 1 plus a three year mandatory supervisory release period. Seven years is the maximum sentence on Count 2 so I will sentence you to seven years on Count 2."

The written sentencing order specified that the two prison terms would run concurrently.

¶ 44    On November 25, 2019, defendant moved for a reduction of the sentence. See 730 ILCS 5/5-4.5-50 (West 2018). His motion gave four reasons for this requested relief. First, the motion claimed that the circuit court had failed to consider unspecified mitigating factors. Second, quoting from *People v. Alexander*, 239 Ill. 2d 205, 212 (2010), the motion criticized the sentence as " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " (Internal quotation marks omitted.) Third, the motion asserted that the court had disregarded the rehabilitative objective of article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Under that section, all penalties were to be "determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *Id.* Fourth, the motion argued that the court had "failed to adequately consider the financial impact of the cost of incarceration of Defendant, as required by [section 5-4-1 of the Unified Code of Corrections (730 ILCS 5/5-4-1 (West 2018))]."

¶ 45    On February 10, 2020, the circuit court denied defendant's motion for a reduction of the sentence.

¶ 46    This appeal followed.

¶ 47                      II. ANALYSIS

¶ 48              A. The Chain of Custody for People's Exhibit No. 1

¶ 49    In drug cases, the alleged controlled substance usually is nondescript. White powder looks much like any other white powder; off-white fragments look much like any other off-white fragments. A reasonable trier of fact, then, would expect an explanation of how the testifying police officer is able to tell that the bag of white powder, for example, that the prosecutor has handed him and has asked him to identify is the same white powder that the police seized from the defendant. See *People v. Woods*, 214 Ill. 2d 455, 466-67 (2005). Because the police are in the business of seizing illegal narcotics and because they may well have many items of such evidence, an explanation would be necessary of how the witness knows that this particular white powder, as distinct from some other white powder, is the white powder that the defendant possessed. Unless precautions are taken, a Baggie corner of suspected narcotics could easily get confused with another Baggie corner of narcotics.

¶ 50    There is an additional risk: white powder that originally was not contraband could easily be made into contraband by being tainted, accidentally or intentionally, with a tiny amount of a controlled substance. See 720 ILCS 570/401(a) (West 2018) (gauging the severity of the punishment by the weight of the substance *containing* the controlled substance). In the event of such contamination, it would be impossible, by looking at the white powder, to tell that it had been altered. See *Woods*, 214 Ill. 2d at 466-67. In short, "in cases *** where a defendant is accused of a narcotics violation, the physical evidence is often not readily identifiable or may be susceptible to tampering, contamination[,] or exchange." *Id.*

¶ 51    Therefore, in drug cases, the State must lay a foundation for the admission of the substance by "establish[ing] a chain of custody." *Id.* at 467. That is, "[t]he State must show that the police took reasonable protective measures to ensure that the substance recovered from the defendant was the same substance tested by the forensic chemist." *Id.*

¶ 52        Typically, for a chain of custody, reasonableness and probability are the standards, not minute comprehensiveness. See *id.* The supreme court explains:

> "Unless the defendant produces evidence of actual tampering, substitution[,] or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination; the State must demonstrate, however, that reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Id.*

Thus, the State must show that the police took "reasonable protective measures" with the suspected substance, not foolproof protective measures. *Id.*

¶ 53        On appeal, defendant argues that "the State failed to establish a chain of custody for People's Exhibit [No.] 1—purported to be the bag [that defendant] delivered to Cox." The State observes, however, that defendant never made such an objection in the trial court. The transcript of the trial bears out the State's observation. In fact, the transcript goes even further by showing that defense counsel affirmatively disclaimed any objection. The circuit court asked defense counsel if he had any objection to the admission of People's exhibit No. 1, and defense counsel answered, "No."

¶ 54        By his attorney, then, defendant invited any error that might have been committed by the admission of People's exhibit No. 1. See *People v. Cox*, 2017 IL App (1st) 151536, ¶ 72 (holding that, by affirmatively answering no to the circuit court's question of whether he objected to the admission of a document, the defendant, through his defense counsel, invited any error in the admission of the document). "Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations

reassure the trial court and encourage it to proceed without further consideration of the issues." *State v. Winfield*, 128 P.3d 1171, 1176 (Utah 2006). Consequently, under the doctrine of invited error, defendant is estopped from contending, on appeal, that People's exhibit No. 1 was inadmissible on the ground of deficiencies in the chain of custody (or on any other ground). See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). This estoppel makes defendant's case distinguishable from cases such as *People v. Howard*, 387 Ill. App. 3d 997, 1002 (2009), cited by him, in which the defendant objected, at trial, to deficiencies in the chain of custody. A chain-of-custody objection to People's exhibit No. 1 would have been an objection that the State had failed to lay a foundation for the admission of the exhibit. See *Woods*, 214 Ill. 2d at 471. Foundational objections can be waived. See *id.*; *People v. Averett*, 237 Ill. 2d 1, 24 (2010); *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 20.

¶ 55        It is true that defendant did not waive his right to have the State prove, beyond a reasonable doubt, that he possessed the methamphetamine. Generally, though, deficiencies in the chain of custody do not make the evidence insufficient to sustain the conviction. Only a "complete breakdown in the chain of custody" can make the chain of custody problematic enough that the defendant's possession (and, therefore, delivery) of the controlled substance is unproven as a matter of law. See *Woods*, 214 Ill. 2d at 471-72. A complete breakdown is "a formidable standard" for a defendant to establish on appeal. *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 32. As the supreme court explained in *Woods*, a chain-of-custody problem becomes a sufficiency-of-the-evidence problem only if there is zero evidence linking the substance to the defendant:

> "For example, in those rare instances where a complete breakdown in the chain of custody occurs—*e.g.*, the inventory number or description of the recovered and

tested items do not match—raising the probability that the evidence sought to be introduced at trial was not the same substance recovered from defendant, a challenge to the chain of custody may be brought under the plain error doctrine. When there is a complete failure of proof, there is no link between the substance tested by the chemist and the substance recovered at the time of the defendant's arrest. In turn, no link is established between the defendant and the substance. In such a case, a failure to present a sufficient chain of custody would lead to the conclusion that the State could not prove an element of the offense: the element of possession." *Woods*, 214 Ill. 2d at 471-72.

Thus, to challenge the sufficiency of the evidence on the ground of the lack of a chain of custody, the defendant must show that the chain of custody is nonexistent, not merely incomplete. The defendant must convince the reviewing court that the record fails to reveal any link at all between the substance and the defendant.

¶ 56       A chain of custody can have "substantial gaps" while still linking the substance to the defendant. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 53. The decision by the Fourth District in *People v. Echavarria*, 362 Ill. App. 3d 599 (2005), illustrates how substantial the gaps can be. The chain of custody in *Echavarria* was as follows. A police officer, John Schweighart, testified that he saw another police officer, Jon Swenson, take a package of suspected cocaine out of the defendant's pants pocket. *Id.* at 607. A third police officer, Dale Rawdin, testified that, when the defendant was arrested, he possessed what the forensic laboratory later determined to be about 23 grams of cocaine. *Id.* Schweighart testified that the exhibit in question in that case, People's exhibit No. 1, "appeared to be the same item removed from [the] defendant's pocket and [that] it was in the same condition as it was when Sergeant Swenson removed it." *Id.* According to a stipulation

by the parties, a chemist, John Martin, would testify that he received People's exhibit No. 1 in a sealed evidence bag from a fourth police officer, Willie Gartrell, and that the enclosed substance was 22.6 grams of a chunky, white powder containing cocaine. *Id.* For the first time on appeal, the defendant in *Echavarria* challenged the chain of custody. *Id.* at 603.

¶ 57 The appellate court in *Echavarria* agreed that the chain of custody suffered from considerable gaps:

> "The record contain[ed] no evidence *** as to what Sergeant Swenson did with the plastic bag he recovered from [the] defendant. No evidence showed the bag was placed in a closed or sealed container or was initialed or dated by Sergeant Swenson. No evidence showed where the bag was stored after it was recovered by Sergeant Swenson or when it came into the possession of Willie Gartrell. *** [It was unexplained] how [Gartrell] was involved in this investigation, how the exhibit came into his possession, or how he stored the exhibit while it was in his custody. *** No evidence showed how a bag taken from [the] defendant ended up in a sealed evidence bag. No evidence showed this bag [was] different in any way from other bags of controlled substances that [might] have been handled by the task force or transported to the lab or stored. No evidence showed the bag presented as exhibit No. 1 [was] the *same* one recovered from [the] defendant by Sergeant Swenson." (Emphasis in original.) *Id.* at 607-08.

Even so, the appellate court concluded that the chain of custody "met the minimum standard enunciated in *Woods*." *Id.* at 608.

¶ 58 The chain of custody in the present case is more detailed than that in *Echavarria*. Brooke testified that after the controlled purchase, Cox brought back to him, along with $40 in

change, "a white, a little pill bag or a jeweler bag *** with a white powdery substance" in it. Brooke further testified that he took the pill bag of powder to the sheriff's department and that, after field-testing the powder, he sealed the pill bag of powder into an evidence bag, which he then locked into the evidence vault. He identified People's exhibit No. 1 as the sealed evidence bag. Brooke believed that only he, "Inspector Benning, Detectives Rork [and] DeMoss, [and] Lieutenant Hamilton" had access to the evidence vault. As far as Brooke knew, People's exhibit No. 1 "remained in that sealed condition in that locked vault until such time that it was transported to the Illinois State Police crime lab." Brooke could tell that People's exhibit No. 1 was "the exact same bag" because his handwriting was on the back of the bag along with his initials, signature, badge number, and the date.

¶ 59　　　　Thus, unlike the testifying police officer in *Echavarria*, Brooke explained how he could identify People's exhibit No. 1. It is true, as defendant points out, that Brooke did not specify what date he had written on the back of People's exhibit No. 1. Nevertheless, when we view the evidence in a light most favorable to the prosecution (see *Woods*, 214 Ill. 2d at 470), it is reasonably inferable—and it would be only logical—that Brooke had written the date he received the evidence: June 5, 2018. Otherwise, he would have been unable to testify that the date notation helped him identify People's exhibit No. 1 as the substance that Cox brought him on June 5, 2018, from defendant. Granted, it is theoretically possible that Brooke recovered other illegal narcotics from other suspects on that date. Such a theoretical possibility, however, does not eliminate the connection between People's exhibit No. 1 and defendant. See *id.* at 472.

¶ 60　　　　Granted, as defendant argues, some links in the chain of custody were left unspecified. For example, Brooke could not remember who took People's exhibit No. 1 to the crime laboratory. The seals of the exhibit, however, appeared to be in order. Brooke identified the

blue seal of the laboratory. A forensic scientist, Michelle Dierker, testified that she "sign[ed] [People's exhibit No. 1] over from another scientist" in the laboratory and that, when Dierker received the exhibit, it was sealed. The prosecutor asked Dierker:

> "Q. And it was sealed in the bag that it's, this plastic bag that it's contained in. Is that correct?
>
> A. Correct. At the time that I received it, the only thing missing would be the blue evidence tape along the bottom of the plastic bag because that's evidence tape that I put there as I resealed the evidence after my analysis."

¶ 61　　　　Also, as defendant notes, the State did not call the scientist who signed People's exhibit No. 1 into the laboratory. Nor did the State prove, for that matter, who transported People's exhibit No. 1 from the sheriff's department to the laboratory. Likewise, in *Echavarria*, no evidence showed how the substance in question was "transported to the lab." *Echavarria*, 362 Ill. App. 3d at 608. Nonetheless, the evidence in *Echavarria* was sufficient to support the conviction. *Id.*

¶ 62　　　　In short, just because, absent an objection by defendant, some links in the chain of custody were left undescribed, it does not follow that defendant's possession of the methamphetamine was unproven as a matter of law. His case is hardly comparable to *People v. Terry*, 211 Ill. App. 3d 968, 973 (1991), cited by him, in which the police officer "inventoried 32 packets with an estimated weight of 8 grams" and the chemist, by contrast, "found 42 packets, weighing approximately 12 grams." Nor is his case comparable to *People v. Gibson*, 287 Ill. App. 3d 878, 882 (1997), also cited by him, in which there was "almost a five-fold increase" between the weight of the substance as recorded in the police station and the weight of the substance as stipulated in the trial. In the present case, the asserted discrepancy between "*approximately* [0.2] grams" and a "tenth of a gram" (0.1 grams) is a matter of rounding. (Emphasis added.) For that

matter, given the use of the qualifier "approximately," there is no discrepancy. In *Echavarria*, the difference between 22.6 grams and "*approximately* 23 grams" did not make the evidence insufficient as a matter of law. (Emphasis added.) *Echavarria*, 362 Ill. App. 3d at 601. It follows that in the present case the difference of a mere tenth of a gram, in approximate terms, does not do so.

¶ 63　　　　In sum, defendant is estopped from raising any deficiencies in the chain of custody. The record shows a link between People's exhibit No. 1 and him. Therefore, we reject his challenge to the sufficiency of the evidence.

¶ 64　　　　Defendant's alternative claim of ineffective assistance of counsel is equally unavailing. A claim of ineffective assistance has two elements: deficient performance and resulting prejudice. *People v. Shipp*, 2020 IL App (2d) 190027, ¶ 31. "Prejudice" means a reasonable probability that, but for the claimed error by defense counsel, the outcome of the trial would have been different. See *People v. Hale*, 2013 IL 113140, ¶ 18. "[W]e may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *Id.* ¶ 17. Let us assume, for the sake of argument, that the omission of a chain-of-custody objection was deficient performance. Even so, to find prejudice from the omission of such an objection, we would have to find a reasonable probability that, if defense counsel had made such a chain-of-custody objection, the State would have been unable to cure the objection (and, consequently, the circuit court would have refused to admit People's exhibit No. 1 and would have acquitted defendant of count IV). In the record before us, we find no basis for asserting a reasonable probability that the State would have been incapable of curing any chain-of-custody objection.

¶ 65　　　　　　　　B. The Motion for Suppression of Evidence

¶ 66    On March 8, 2019, defendant filed a motion for the suppression of evidence, in which he asserted "a reasonable expectation of privacy in respect to the residence" at 838 South Locust Street. The motion then made three observations about the complaint for a search warrant. First, neither Brooke nor the confidential source reported that any illegal substance had been purchased inside the residence. Second, neither Brooke nor the confidential source reported seeing any methamphetamine inside the residence. Third, neither Brooke nor the confidential source reported seeing defendant going into or coming out of the residence. Because of those claimed shortcomings in the complaint for a search warrant, the motion argued that the search of 838 South Locust Street was unsupported by probable cause and hence was unlawful. Consequently, the motion requested the suppression of all evidence that was the fruit of the search, including physical evidence, descriptions of what the police saw inside the house, and oral statements by defendant to the police. The circuit court denied the motion.

¶ 67    Defendant contends that the denial of his motion for the suppression of evidence was erroneous because the complaint for a search warrant failed to show a nexus between the delivery of methamphetamine and the residence itself. In other words, quoting from *People v. Manzo*, 2018 IL 122761, ¶ 35, he argues that the complaint failed to establish "reasonable cause to believe that the specific things to be searched for and seized [were] located on the property to which entry [was] sought." (Internal quotation marks omitted.) In *Manzo*, the supreme court concluded that "the information set forth in the sworn complaint [for a search warrant] fail[ed] to connect [the] defendant's home to [the] drug sales." *Id.* ¶ 46. Defendant regards *Manzo* as "instructive on this issue."

¶ 68    *Manzo*, however, is distinguishable in its facts. In *Manzo*, the affidavit for a search warrant presented no evidence that the drug dealer was a frequent visitor at the searched residence,

let alone that he lived there. *Id.* ¶ 10. Also, none of the drug sales occurred at the residence. *Id.* ¶ 44. In the present case, by contrast, the complaint for a search warrant represented that 838 South Locust Street was "the parole address listed for [defendant]" and that on June 5, 2018, the confidential source bought methamphetamine from defendant in the backyard of that address. Other cases cited by defendant are distinguishable for the same reason that *Manzo* is distinguishable: the drug sale did not occur at the address known to be the defendant's residence.

¶ 69    Granted, the drug sale did not occur inside the residence. Rather, it occurred outside the residence, in the backyard. The question, then, is whether a controlled purchase that took place in the yard of a house in which the drug seller is known to reside creates probable cause to search the interior of the house. Surprisingly, we have found no Illinois case that addresses this precise question. In the view of other jurisdictions, however, there would be probable cause to search the residence. *United States v. Arguelles*, No. 12-20305, 2012 WL 4513781, at *3 (E.D. Mich. Sept. 29, 2012); *United States v. Solomon*, No. 1:11CR32-1, 2011 WL 1704721, at *10 (M.D.N.C. May 4, 2011); *Commonwealth v. Alcantara*, 760 N.E.2d 1236, 1239 (Mass. App. Ct. 2002). The Eastern District of Michigan reasoned as follows:

> "Police officers observed a drug transaction in the backyard of the residence the day the warrant was obtained and executed. This alone establishes probable cause to search the entire residence, which is alleged to be under the control of [the] [d]efendant, as it implies that [the] [d]efendant was using his home as a base for ongoing criminal activity." *Arguelles*, 2012 WL 4513781, at *3.

¶ 70    We find the reasoning in *Arguelles* to be persuasive. If a defendant sells drugs in the backyard of a house known to be the defendant's residence, a person of reasonable caution would infer that the defendant probably is using the house as a base for ongoing drug trafficking

and that evidence of drug trafficking therefore could be found inside the house. See *People v. Teague*, 2019 IL App (3d) 170017, ¶ 11 (explaining that "[p]robable cause exists when the totality of the facts and circumstances within the affiant's knowledge at that time was sufficient to warrant a person of reasonable caution to believe that the law was violated and [that] evidence of [the violation] is on the premises to be searched" (internal quotation marks omitted)). Thus, in our *de novo* review, we affirm the denial of defendant's motion to suppress evidence. See *People v. Lyons*, 373 Ill. App. 3d 1124, 1127 (2007) (holding that the appellate court "review[s] *de novo* a trial court's ruling on a motion to suppress when the underlying facts are not in dispute and the only question is the adequacy of the affidavit attached to the complaint for the warrant"). The complaint for a search warrant described a nexus between the controlled purchase and defendant's known residence, 838 South Locust Street. See *Manzo*, 2018 IL 122761, ¶ 35.

¶ 71                           C. The Right to a Public Trial

¶ 72        Defendant claims that by viewing outside his presence People's exhibit No. 4, the postarrest video of his interrogation, the circuit court violated his due-process right to a public trial. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 8; *People v. Lucas*, 2019 IL App (1st) 160501, ¶ 12. The court asked the parties ahead of time, "Any objection to me viewing the interview of the Defendant outside of the courtroom?" Defense counsel answered, "No." Thus, the court did not ask defense counsel if he objected to the court's viewing the video outside defendant's presence. Instead, the court asked him if he objected to the court's viewing the video outside the courtroom. By answering no to that question, defense counsel did not affirmatively assent to defendant's noninclusion in the viewing of the video. This time, therefore, instead of an invited error, there was merely a procedural forfeiture resulting from the omission of an objection to defendant's noninclusion at the video viewing. See *People v. Holloway*, 2019 IL App (2d) 170551,

¶ 44. The doctrine of plain error, invoked by defendant, can avert a procedural forfeiture. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 73        The first question in plain-error review is whether a clear or obvious error was committed. *Id.* Defendant compares his case to *Lucas*, 2019 IL App (1st) 160501, ¶ 21, in which the appellate court found that an in-chambers viewing of a traffic-stop video outside the defendant's presence violated her right to a public trial. In *Lucas*, however, the circuit court viewed the video *before* admitting the video in evidence. *Id.* ¶ 6. In the present case, by contrast, it appears that the circuit court viewed the video *after* admitting the video in evidence. The prosecutor offered People's exhibit No. 4 in evidence. The court asked defense counsel if he had any objection, and defense counsel answered no. At that point, it is true, the court did not explicitly say, "People's exhibit No. 4 is admitted." It is fairly implied, though, that as soon as defense counsel answered that he had no objection to the admission of the exhibit, the exhibit was admitted. The docket entry for May 30, 2019, reads, "People's Exhibit *** #4 admitted, no objection." After the admission of People's exhibit No. 4, the court asked defense counsel if he had any objection to the court's viewing the video outside the courtroom, and defense counsel again answered no. Thus, the court first admitted the postarrest video in evidence, and then, evidently sometime afterward, the court viewed the video. The appellate court has distinguished *Lucas* from a case in which the circuit court viewed a video outside the defendant's presence *after* admitting the video in evidence. See *People v. Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31.

¶ 74        Defendant has moved for permission to cite as supplemental authority *People v. Flagg*, 2021 IL App (1st) 191692-U, which extended the rationale of *Lucas* to a case in which the circuit court viewed a video outside the defendant's presence *after* admitting the video in evidence (see *id.* ¶ 2). We grant the motion.

¶ 75        In *Flagg*, the record was unclear whether the defendant personally had viewed the videotaped statement of the sexual-assault victim before the circuit court viewed it. After admitting the video in evidence, the court watched the video in chambers, without playing it in open court. *Id.* ¶ 25. The defendant claimed that the court thereby violated his constitutional right to be present at all critical stages of the proceeding. *Id.* ¶ 44. The defendant never preserved this claim through a contemporaneous objection and a reiteration of the objection in a posttrial motion. *Id.* ¶ 45. Nevertheless, he argued that the doctrine of plain error should avert the procedural forfeiture of this claim. *Id.*

¶ 76        " 'The first step of plain-error review,' " the appellate court reasoned in *Flagg*, " 'is determining whether any error occurred.' " *Id.* (quoting *People v. Thompson*, 238 Ill. 2d 598, 613 (2010)). (According to more recent case law from the supreme court, the first step in plain-error review is determining whether any *clear or obvious* error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60; *People v. Downs*, 2015 IL 117934, ¶ 15.) Under the Illinois and United States Constitutions, a criminal defendant has a " 'right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' " *Flagg*, 2021 IL App (1st) 191692-U, ¶ 46 (quoting *People v. Lofton*, 194 Ill. 2d 40, 67 (2000)). Citing *Lucas*, the defendant in *Flagg* argued that "the [circuit] court's viewing of the *** video was a critical stage because his absence prevented him from reviewing all the evidence against him before deciding whether to testify." *Id.* ¶ 47. The appellate court in *Flagg* was persuaded by that argument since it was unclear from the record whether the defendant ever viewed the video. *Id.* ¶ 51.

¶ 77        The appellate court explained in *Flagg*:

"On this understanding [(that the circuit never ensured that the defendant viewed the video before the court viewed it)], the court's decision to view the *** video in chambers denied [the] defendant his right to be present at a critical stage because the [video] was a significant aspect of the evidence against him. *** [T]he court stated it considered the *** video in arriving at its guilty finding, explaining that the *** video bolstered [the victim's] credibility. It follows that this evidence was significant, and therefore [the] defendant had a right to review it before deciding whether to testify, which the court denied him by viewing the *** video only in chambers." *Id.*

¶ 78    In its defense of that holding, the appellate court in *Flagg* distinguished some cases from the Fourth District. The *Flagg* court distinguished *People v. Myles*, 2020 IL App (4th) 180652, because in *Myles* "the defendant's testimony revealed he saw the video evidence at issue before deciding whether to testify." *Flagg*, 2021 IL App (1st) 191692-U, ¶ 54. The *Flagg* court also distinguished *People v. Young*, 2013 IL App (4th) 120228, because in *Young* the appellate court did not consider "a defendant's right to be present for the introduction of significant evidence against him at trial" but instead considered whether the viewing of a video in chambers during a section 115-10 (725 ILCS 5/115-10 (2010)) hearing was a critical stage. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 54.

¶ 79    The *Flagg* court, however, did not discuss *Maniwa*, a decision that the Fourth District filed a month before the First District decided *Flagg*. Nor did the *Flagg* court discuss Justice Steigmann's special concurrence in *People v. Duckworth*, 2021 IL App (4th) 180740-U, ¶¶ 140-149 (Steigmann, J., specially concurring), a special concurrence that the *Maniwa* court endorsed. See *Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31.

¶ 80 In *Maniwa*, the defendant was charged with four counts of possessing child pornography. *Id.* ¶ 2. He was tried in a bench trial. *Id.* People's exhibit No. 3 was a DVD containing the four videos that were the bases of the four counts. *Id.* ¶¶ 9, 19. The circuit court admitted the DVD in evidence. *Id.* ¶ 9. Upon completion of the testimony, the proceedings went into recess. *Id.* ¶ 20. When the proceedings reconvened, the court noted, for the record, that it had reviewed the State's exhibits (including the DVD). *Id.* After closing arguments, the court found the defendant guilty of all four counts. *Id.* ¶ 21. The court sentenced him to imprisonment. *Id.* ¶ 22.

¶ 81 On appeal, the defendant in *Maniwa* claimed he had been "denied his constitutional right to be present at all critical stages of his trial when he was not present for the trial court's viewing of State's exhibit No. 3," the DVD. *Id.* ¶ 26. The Fourth District explained that "whether the defendant's absence occurred at a critical stage is answered by considering whether 'the defendant's presence *at the proceeding* would have contributed to his opportunity to defend himself against the charges.' " (Emphasis added.) *Id.* ¶ 29 (quoting *Lofton*, 194 Ill. 2d at 67). The Fourth District agreed with Justice Steigmann's special concurrence in *Duckworth* that " 'a trial judge's consideration of already admitted evidence does not constitute a "hearing" ' or proceeding." *Id.* ¶ 31 (quoting *Duckworth*, 2021 IL App (4th) 180740-U, ¶ 145 (Steigmann, J., specially concurring)). The Fourth District further agreed with Justice Steigmann that an admitted video was comparable to admitted documentary evidence and that the defendant's presence in chambers as the judge reviewed an admitted video would not have contributed to the defendant's ability to mount a defense any more than if the defendant were present in chambers as the judge reviewed documentary evidence. *Id.*

¶ 82 Presumably, the *Flagg* court would disagree with that analysis in *Maniwa*. If the defendant had known the contents of the video, the First District reasoned in *Flagg*, the defendant

could have made a better-informed decision of whether to take the stand and testify on his own behalf. See *Flagg*, 2021 IL App (1st) 191692-U, ¶ 51. There was "insufficient indication in the record for [the *Flagg* court] to conclude that [the defendant] ever saw [the video]." *Id.* ¶ 51.

¶ 83    The logic of *Flagg*, however, would lead to an implausible conclusion: a judge would be forbidden to read, in the privacy of chambers, a document admitted in evidence unless the record affirmatively disclosed that the defendant personally had read the document first. *Cf. Duckworth*, 2021 IL App (4th) 180740-U, ¶ 148 (Steigmann, J., concurring) (posing the rhetorical question "[C]ould anyone really argue that a defendant had a constitutional right to be present at this so-called 'critical stage of the trial' so defendant could watch the judge as he reviews [numerous admitted documents] on the bench?"). After all, the only difference between an admitted document and an admitted video is that equipment is necessary to view the video (unless the judge uses reading glasses and would need that equipment to view the document). It seems to us, then, that the reasoning in *Maniwa* is more persuasive than that in *Flagg*. The judge's viewing of the admitted postarrest video in chambers was not a "proceeding," and therefore the viewing did not violate defendant's constitutional right to be present at all critical stages of the proceeding. See *Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31.

¶ 84    "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Lofton*, 194 Ill. 2d at 67. Aside from the problem that a judge's scrutiny of admitted evidence in chambers is not a "proceeding," defendant offers no convincing explanation of how his presence in chambers during the viewing of the postarrest video would have contributed to the fairness of the procedure. The content of the video would have been identical from one showing to the next. The State disclosed the video in discovery and offered to make copies of the

video for the defense if the defense provided a blank DVD. As far as we know, nothing prevented defendant from watching the video himself. It is unclear why defendant, as *Flagg* would put it, was " 'able to view all of the State's evidence against him at trial' " only if he watched the video while the judge was watching it. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 48 (quoting *People v. Richardson*, 2021 IL App (1st) 190821, ¶ 53). Since the video was of defendant's being interviewed by the police, he must have known what was in the video. Defendant argues, however, that he was deprived of the opportunity to see the judge's facial expressions and other body language as the judge watched the video. This benefit would be "but a shadow." (Internal quotation marks omitted.) *Lofton*, 194 Ill. 2d at 67. In sum, then, in our *de novo* review, we find no violation of defendant's right to be present at a critical stage of the proceeding. See *Maniwa*, 2021 IL App (4th) 190796-U, ¶ 29.

¶ 85                                    D. The Defense of Entrapment

¶ 86            Defendant claims that his defense counsel rendered ineffective assistance by omitting to raise the defense of entrapment. See 720 ILCS 5/7-12 (West 2018). For defense counsel to have raised the defense of entrapment, however, defendant would have had to admit committing unlawful delivery of methamphetamine. See *People v. Cooper*, 239 Ill. App. 3d 336, 350-51 (1992). We quote from defendant's brief: "Though [defendant] did make statements to the police following his arrest, he repeatedly denied delivering meth." Because defendant never admitted delivering methamphetamine to Cox, defense counsel was justified in not raising the affirmative defense of entrapment. See *People v. Trice*, 2017 IL App (4th) 150429, ¶ 31. Defense counsel's chosen strategy, instead, was to argue that defendant never committed the charged offenses. It would have been "both factually and legally inconsistent for" defendant "to deny committing the offense and then to assert as a defense that he committed the offense, but only because of

incitement or inducement by the authorities." (Internal quotation marks omitted.) *Id.* Effective assistance of counsel does not entail making inconsistent claims.

¶ 87                              E. The Severity of the Sentence

¶ 88              1. *The State's Motion to Strike Some Authorities From Defendant's Brief*

¶ 89              In arguing to us that the sentence for count I is too severe, defendant informs us that he "started using drugs after he was prescribed pain killers following a surgery when he was 15." (He cites the presentence investigation report, in which he made that representation to the investigating officer, Ron R. Baker.) Defendant continues in his brief, "In a 2019 National Survey on Drug Use and Health conducted by the Substance Abuse and Mental Health Services Administration, it was reported that 9.7 million people aged 12 or older misused prescription pain relievers. [Citation.] The [Centers for Disease Control and Prevention (CDC)] has categorized the opioid abuse as an epidemic. [Citation.]" The State has moved to strike from defendant's brief the citations for those two online articles because defendant never presented those articles in the sentencing hearing. The State further moves that, in ruling on its motion to strike the articles, we refrain from considering the oral argument in a different appeal, *People v. Klein*, No. 4-20-0599 (Dec. 1, 2020). Because the record and arguments before us adequately equip us to rule on the State's motion to strike the articles, we grant the State's motion that we refrain from considering *Klein*.

¶ 90              Because the articles are official governmental publications, an argument could be made for taking judicial notice of them on appeal. The Substance Abuse and Mental Health Services Administration is a federal agency under the United States Department of Health and Human Services. The CDC is a federal agency under the United States Department of Health and Human Services. The appellate court has held that it may take judicial notice of information on

official governmental websites. *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 44.

¶ 91　　　　If the information, however, is evidence that should have been presented in the proceeding below, the appellate court will decline to take judicial notice of the information. *Cook County Board of Review v. Property Tax Appeal Board*, 339 Ill. App. 3d 529, 542 (2002); *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994); *People v. Mehlberg*, 249 Ill. App. 3d 499, 531 (1993). The articles by the Substance Abuse and Mental Health Services Administration and the CDC are evidence that defendant should have presented in the sentencing hearing so as to allow the State a fair opportunity to (1) present counterevidence and (2) make arguments to the circuit court against the evidence.

¶ 92　　　　Even so, the State's requested remedy of "striking" the citations is problematic for two reasons. First, to "strike" some lines of text is to "delete" them. Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/strike [https://perma.cc/3Q2N-VXEW] (last visited Feb. 22, 2022). In this age of electronic briefs, the appellate court no longer crosses out passages in a brief with a black marker (if the appellate court ever did so). Nor does our software allow us to remove text from a brief by holding down the delete button. We are reluctant to grant a motion to strike parts of a brief unless we really are able to strike parts of a brief. Second, even if we assumed that "striking" text from a brief retains any meaning, such striking is not supposed to be routine. Rather, the "striking of an appellate brief, in whole or in part, is a harsh sanction and is appropriate only when the alleged violations of procedural rules interfere with or preclude review." (Internal quotation marks omitted.) *Independent Trust Corp. v. Kansas Bankers Surety Co.*, 2016 IL App (1st) 143161, ¶ 33. Defendant's citations of the articles by the Substance Abuse and Mental Health Services Administration and the CDC do not interfere with or preclude

review. Therefore, while disregarding the cited materials as outside the record, we deny the State's motion to strike the citations from defendant's brief.

¶ 93                                 2. *The Claim of Double Enhancement*

¶ 94             Defendant claims that his defense counsel rendered ineffective assistance by failing to object to the circuit court's consideration, as an aggravating factor, that defendant received compensation for unlawfully delivering the methamphetamine to Cox. See *People v. McCain*, 248 Ill. App. 3d 844, 851 (1993) (noting that, although unlawful delivery of a controlled substance can be committed without compensation, few drugs are delivered as gifts and hence "it is generally improper to consider compensation to be a factor in aggravation"). Again, "we may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *Hale*, 2013 IL 113140, ¶ 17. Because the circuit court gave "minimal" weight to the factor of compensation, we find no reasonable probability that the sentence that defendant received for unlawful delivery of methamphetamine would have been lighter had defense counsel objected to the consideration of compensation. See *id.* ¶ 18; *cf. People v. Beals*, 162 Ill. 2d 497, 509-10 (1994) (holding that, "[w]here it can be determined from the record that the weight placed upon the improperly considered aggravating factor was insignificant and that it did not lead to a greater sentence, remandment is not required" and finding that "any weight that the trial court placed on the fact that the defendant's conduct caused the ultimate harm was insignificant[ ] and did not result in a greater sentence"); *People v. Minter*, 2015 IL App (1st) 120958, ¶ 152 ("[W]here the trial court appears to place minimal emphasis upon an improper factor, a new sentencing hearing is not required.").

¶ 95                                 3. *Inducing the Offense*

¶ 96    That "[t]he defendant's criminal conduct was induced or facilitated by someone other than the defendant" "shall be accorded weight in favor of *** minimizing a sentence of imprisonment." 730 ILCS 5/5-5-3.1(a)(5) (West 2018). Defendant contends that, in determining his sentence, the circuit court neglected to consider that mitigating factor. A failure to consider a statutory mitigating factor is an abuse of discretion. *People v. Miller*, 2021 IL App (2d) 190093, ¶ 22. Defendant accuses defense counsel of rendering ineffective assistance by failing to raise the mitigating factor in section 5-5-3.1(a)(5).

¶ 97    Defense counsel could have reasonably perceived, however, that it was defendant who induced Cox instead of the other way around. Cox responded to a Facebook message by defendant that he, defendant, "had something." Arguably, defendant attempted to entice Cox further by sending him pictures of the methamphetamine he was manufacturing. Defendant was so eager to sell methamphetamine to Cox that defendant was undeterred by the lights that came on in Benning's truck. The characterization of Cox as the inducer is not necessarily convincing. Defendant, rather, appears to have suggested to Cox that he was open for business. So, we find no ineffective assistance in defense counsel's probably wise decision not to portray defendant as having been corrupted by Cox.

¶ 98                    4. *Addiction*

¶ 99    Claiming that "[t]he majority of his criminal history is a symptom of his drug problem," defendant complains that the circuit court failed to consider his addiction as a mitigating factor. Because the Unified Code of Corrections, however, does not list drug addiction as a mitigating factor or an aggravating factor (730 ILCS 5/5-5-3.1(a), 5-5-3.2(a) (West 2018)), a sentencing court need not regard drug addiction as either aggravating or mitigating. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105. The supreme court, in fact, has specifically held that

a sentencing court is not required to consider drug addiction as a factor in mitigation. *People v. Mertz*, 218 Ill. 2d 1, 83 (2005). A sentencing court may conclude that a "defendant's drug addiction lessened his rehabilitative potential, increased the seriousness of the offense, increased the need to protect society, and increased the need for deterrence." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 108. Drug addiction can be deemed a factor in aggravation if the addiction causes additional future unpredictability and criminal behavior or a low potential for rehabilitation. *Mertz*, 218 Ill. 2d at 83-84.

¶ 100    Arguably, judging from his treatment history, defendant is not a promising candidate for rehabilitation. We quote from the presentence investigation report:

"He reported having tried methamphetamine in February of 2018 and commented, 'once tried that was it.' He became quickly addicted and used up until the time of his arrest.

\* \* \*

Past efforts at treatment have included outpatient at [the Institute for Human Resources] in 2010 when he was 16. While on Probation in 2013, he completed 28 days of Inpatient at Heritage Behavior Health in Decatur, IL. He then began the recommended after care but did not complete it. He reported having returned to Heritage in 2018 for detox and was placed on the waiting list for treatment, but he never entered it. He indicated he has been in detox 5 to 6 times in his life.

The defendant expressed having developed a clearer understanding of his addiction while incarcerated pending this case and advised he 'doesn't want to do it anymore.' "

This claim of having a clearer understanding and this resolution to stop abusing drugs could be discounted as what is commonly said on the eve of a sentencing hearing. The history set forth in the presentence investigation report could give little cause for optimism. Defendant began drug treatment "but did not complete it." He got on the waiting list for treatment, "but he never entered [treatment]." If his drug problem is intractable and if it causes him to commit crime, society's need to be protected from him is just as pressing regardless of what caused him to have a drug problem. Regardless of the circumstances that led to his addiction to methamphetamine, such as a surgery he underwent when he was a teenager, he is a threat to those whom he would cause to become, like him, a methamphetamine addict. Likewise, he is a threat to those whose addiction he would feed.

¶ 101　　　　We are unable to say, then, that the circuit court abused its discretion by considering defendant's drug addiction as a factor in aggravation instead of as a factor in mitigation. Nor are we able to say that defense counsel rendered ineffective assistance by omitting to argue that defendant's drug addiction was mitigating. If, as defendant represents, "[t]he majority of his criminal history is a symptom of his drug problem," the court was justified in regarding his drug addiction as a factor in aggravation. See *id.*; *Sturgeon*, 2019 IL App (4th) 170035, ¶ 108.

¶ 102　　　　　　　　　　　　　　　5. *A Trial Tax*

¶ 103　　　　Defendant contends that his sentence was an abuse of discretion in that the circuit court, he believes, imposed a trial tax for his rejection of the State's plea offer and his choice to stand trial. He observes that "[a] defendant may not be punished for exercising his right to trial." See *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26; *People v. Johnson*, 2018 IL App (1st) 153634, ¶ 18. He criticizes his defense counsel for failing to object to the alleged trial tax.

¶ 104        We will find a trial tax only if it is *clearly evident* from the record that the circuit court, in its determination of a sentence, penalized the defendant for choosing to stand trial. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26; *Johnson*, 2018 IL App (1st) 153634, ¶ 18. It is one thing to treat the demand for a trial as an aggravating factor that calls for more years of imprisonment. By doing so, a court would impose a trial tax. See *People v. Moriarty*, 25 Ill. 2d 565, 567 (1962) (in which the judge linked the increased sentence to the rejected plea offer by telling the defendant that his rejection of the plea deal " 'will cost you nine years additional' "). It is another thing to evaluate the sincerity of the defendant's posttrial acceptance of responsibility by stating what cannot be seriously denied, namely, that by insisting on a trial—as, make no mistake, the defendant was entitled to do—the defendant did not then accept responsibility. In a sentencing hearing, a defendant cannot present himself as accepting responsibility while exempting that presentation from commonsense scrutiny.

¶ 105        By remarking in so many words, "You accept responsibility now, when you are about to be sentenced, but you did not accept responsibility a short while ago, in the trial," the judge would not clearly punish the defendant for demanding a trial. Instead, the judge would consider whether the defendant's acceptance of responsibility, in his statement in allocution, is more tactical than genuine. In other words, instead of treating the demand for a trial as a factor in aggravation, the judge would evaluate a claimed factor in mitigation: an "attitude[ ]" of remorse that the defendant presents himself as having. 730 ILCS 5/5-5-3.1(a)(9) (West 2018). The judge has to decide whether, or to what extent, to believe the statement in allocution. As the Fifth Circuit observes:

> "Of course, accepting responsibility for a crime entails admitting the crime, while trial strategies predicated upon a claim of innocence entail denial of the crime. A

defendant who maintains her innocence at trial, and then purports to accept responsibility afterward, may have a difficult time persuading the trial judge that her later position is sincere rather than merely convenient." *United States v. Thomas*, 870 F.2d 174, 177 (5th Cir. 1989).

¶ 106    The circuit court explicitly acknowledged that defendant was "entitled to maintain [his] innocence." The court also acknowledged defendant's acceptance of responsibility, noting, however, that it was a *posttrial* acceptance of responsibility. We are unconvinced that the mere observation "But we did have a full-blown trial on this case" clearly evinced an intention to punish defendant for insisting on a trial. See *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26; *Johnson*, 2018 IL App (1st) 153634, ¶ 18. In context, all the court did was assess the sincerity of defendant's acceptance of responsibility. The court never suggested that "the sentence was at least partly a penalty for rejecting a plea offer." *Johnson*, 2018 IL App (1st) 153634, ¶ 18.

¶ 107    But there is another way, other than the circuit court's saying so, by which the record can show the imposition of a trial tax: if the court "imposed a sentence so outrageously higher than the one offered pretrial that the only conclusion can be that the trial court punished [the defendant] for exercising his right to trial." *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 27. The prison sentence that the circuit court imposed upon defendant was seven years longer than the one the State had offered before the trial. In a case that defendant cites, the appellate court held, "[The defendant's] sentence, which amounts to just over a twofold increase from the pretrial offer, is not so outrageously disproportionate that we are left only to conclude that it was the product of a trial tax." *Id.* It follows that a trial tax cannot be reasonably inferred from a prison term of 25 years as opposed to the pretrial offer of 18 years.

¶ 108   The failure of defendant to show that any clear or obvious error was committed in the sentencing hearing defeats both his claim of ineffective assistance and his claim of plain error. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 109   6. *The Severity of the Sentence for Aggravated*

*Participation in Methamphetamine Manufacturing*

¶ 110   Defendant argues that 25 years' imprisonment for count I, aggravated participation in methamphetamine manufacturing (720 ILCS 646/15(b)(1)(B) (West 2018)), is excessive. The statutory range of imprisonment for this offense is not less than 6 years and not more than 30 years. *Id.* § 15(b)(2)(A). Imprisonment for 25 years was not the maximum possible term that defendant could have received, but it was toward the upper end of the range. The question is whether the circuit court abused its discretion by sentencing defendant to a term of imprisonment that was five years short of the maximum.

¶ 111   "Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212.

¶ 112   As defendant points out, the most important sentencing factor is the seriousness of the offense. To quote the appellate court, "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *People v. Charles*, 2018 IL App (1st)

- 38 -

153625, ¶ 47. The word "offense," in the phrase the "seriousness of the offense," means not the statutory offense in the abstract but the offense as committed by the defendant: the particular facts and circumstances of the defendant's offense. A statutory element of aggravated participation in methamphetamine manufacturing is that "the person knowingly does so in a structure *** where a child under the age of 18 *** resides." 720 ILCS 646/15(b)(1)(B) (West 2018). Arguably, for four reasons, defendant's offense was an especially egregious way of accomplishing that abstract statutory definition. First, whereas the statute required that only one child live in the structure, two children lived at 838 South Locust Street. Second, whereas any child under 18 years of age triggered the statute, the two children at 838 South Locust Street were considerably younger, 7 and 8 years old. Consequently, they were less able to protect themselves and less able to recognize their endangerment than, say, a 17-year-old child. Third, according to Brooke's testimony, the "bag and vapors" were not merely in the same structure in which the children lived but were directly below their bedrooms. Fourth, these children were defendant's nieces, of whom one might have expected an uncle to feel protective. Arguably, then, the offense as committed by defendant was especially serious.

¶ 113    In addition to the seriousness of the offense, the circuit court could have taken into account that defendant had, as an adult, three prior felony convictions (two convictions of theft and one conviction of residential burglary) and seven misdemeanor convictions. That "the defendant has a history of prior delinquency or criminal activity" "may be considered by the court as [a] reason[ ] to impose a more severe sentence." 730 ILCS 5/5-5-3.2(a)(3) (West 2018). A further significant aggravating factor is that defendant committed the present offense while he was on mandatory supervised release.

¶ 114       In sum, we disagree with defendant that the evidence in his sentencing hearing was closely balanced. Given the circumstances of count I, defendant's prior criminal record, and his reoffending while on mandatory supervised release, we are unable to say that 25 years' imprisonment is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212. Finding no abuse of discretion in the sentence, we decline his request to reduce the sentence on count I or to remand the case for a new sentencing hearing.

¶ 115                            III. CONCLUSION

¶ 116       For the foregoing reasons, we affirm the circuit court's judgment.

¶ 117       Affirmed.

**No. 4-20-0081**

| | |
|---|---|
| **Cite as:** | *People v. Aquisto*, 2022 IL App (4th) 200081 |
| **Decision Under Review:** | Appeal from the Circuit Court of Livingston County, No. 18-CF-166; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Mariah K. Shaver, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Randy Yedinak, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Kerri Davis, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |